James BRYANT, et al.,
Plaintiffs-Appellants,

v.

INTERNATIONAL FRUIT PRODUCTS COMPANY, INC., et al.,
Defendants-Appellees.

Nos. 85–3183, 85–3229.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 17, 1986.

Decided June 12, 1986.

Rehearing Denied July 10, 1986.

Wellford, Circuit Judge, filed dissenting opinion and also dissented from denial of rehearing.

Paul H. Tobias (argued), Tobias & Kraus, Cincinnati, Ohio, for plaintiffs-appellants.

Clement J. DeMichelis (argued), Harold S. Freeman, Cincinnati, Ohio, for defendants-appellees.

Before LIVELY, Chief Judge, and MERRITT and WELLFORD, Circuit Judges.

LIVELY, Chief Judge.

This action was brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* (1982). The question for decision is whether the employer effectively amended a pension plan to provide that upon termination, any excess funds in the trust after payment of defined benefits to participants would revert to the employer. The district court determined that the employer had lawfully amended the plan, and entered summary judgment for the defendants. *Bryant v. International Fruit Products Co., Inc.*, 604 F.Supp. 890 (S.D.Ohio 1985).

## I.

### A.

The plaintiffs are all former employees of the defendant International Fruit Products Company, Inc. (the company). The defendants are the company and the trustees of a pension fund. The termination of the fund by the company precipitated this litigation.

The company created a pension plan for its employees in 1944. In 1959 the company rewrote the original trust agreement that contained the terms of the plan. The 1959 agreement created "The International Fruit Products Company Pension Trust." Under the 1959 agreement all contributions to the pension trust were to be made by the company. The agreement established a defined benefit plan. Under such a plan, the

employer is required to make sufficient contributions to provide specified pensions to participating employees. Under a defined benefit plan the employer does not make contributions to an individual account for each participant; rather, the contributions are made to an account or several accounts which provide funding for the pensions of all the participants. The 1959 agreement created a "qualified pension plan" under the Revenue Act of 1954. One of the requirements of a qualified plan is that no part of the corpus or income of a pension trust be "used for, or diverted to, purposes other than for the exclusive benefit of [the employer's] employees or their beneficiaries." 26 U.S.C. § 401(a)(2).

The 1959 agreement contained two provisions dealing with diversion of funds from the pension trust:

Section 5.3 In no event and under no circumstances shall any contributions to this Trust by the Employer, nor any of the Trust Estate or the income therefrom, revert to or be repaid to the Employer; and all amounts paid by the Employer to the Trustees shall be used and applied for the sole and exclusive benefit of the participants under this Trust or their beneficiaries or estates.

\* \* \* \* \* \*

Section 13.1 The Employer expressly reserves the right to amend this Trust from time to time, either on the motion of the Trustees, or upon the Employer's own initiative; provided, however, that no such amendment shall cause or permit any part of the Trust Estate to revert to or be repaid to the Employer or be diverted to any purpose other than the exclusive benefit of the participants or their beneficiaries or estates. . . .

The agreement reserved to the company the right to terminate the trust, and provided that the interest of each participant would become completely vested upon termination. The agreement stated that the trust was created with the intent that it qualify under section 401(a) of the Internal Revenue Code.

**B.**

Following the enactment of ERISA the company "amend[ed] and restate[d]" the pension plan in its entirety by a document dated April 27, 1976 (the 1976 plan). The provisions of section 5.3 and 13.1 of the 1959 agreement were omitted. The limitation on diversion was restated in two sections:

Section 8.2 It shall be impossible at any time prior to the complete satisfaction of all liabilities with respect to Members and their Beneficiaries under this plan for any part of the Trust Fund to be used for, or diverted to, purposes other than the exclusive benefit of the Members and their Beneficiaries.

\* \* \* \* \* \*

Section 11.1 The Employer shall have the right to alter or amend this Plan at any time in whole or in part, provided that no amendment shall authorize or permit any part of the Trust Fund to be used for or diverted to any purpose other than the exclusive benefit of the Members or their Beneficiaries, and provided further that no amendment shall serve to deprive any Member or Beneficiary of a deceased Member of any of the values to which he is entitled under this Plan with respect to contributions previously made.

The company's right to terminate the plan was restated in section 11.2, and for the first time reference was made to allocation of assets:

The rights of all Members to benefits accrued to the date of such termination to the extent funded, shall be fully vested and non-forfeitable and the assets of the Trust Fund shall be allocated among the Members and their beneficiaries in accordance with Section 4044(a) of the Act as now in effect or hereafter amended and administered and distributed at such time or times as is determined by the Trustees.

Section 4044(a) of the Act (ERISA), 29 U.S.C. § 1344(a), referred to in the newly-added language, sets the order of priority of participants and beneficiaries upon ter-

mination of a single-employer defined benefit plan.

### C.

On May 25, 1982 the company amended the plan again to add a new provision to section 11.2:

After fulfillment of all obligations provided for in this Section 11.2, any portion of the Trust Fund remaining as a result of actuarial error shall be returned to the Employer.

This provision for reversion of excess funds to the company also derived from ERISA. Section 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1), deals with the distribution of "residual" assets:

(d) Distribution of residual assets; remaining assets

(1) Any residual assets of a single-employer plan may be distributed to the employer if—

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

The reference to "actuarial error" had its genesis in a regulation of the Internal Revenue Service permitting a qualified plan to contain a provision for recovery of a surplus caused by such error. 26 C.F.R. § 1.401–2(b)(1).

The resolution of the company's board of directors which added the reversion provision also terminated the pension plan as of July 1, 1982. Upon termination, $61,000 was distributed to participants and the excess of $139,000 was returned to the company.

### II.

The district court found that the three requirements of ERISA section 4044(d) for distribution of excess funds to the company had been satisfied. The plaintiffs conceded that the first two were met—all liabilities to participants and their beneficiaries had

been paid in full, and the distribution did not contravene any provision of law. However, relying on the absolute prohibition against such a distribution in section 5.3 of the 1959 agreement, and the limitation on the right to amend in section 13.1, the plaintiffs argued that the third requirement of section 4044(d) was not met; *i.e.*, the plan did not provide for such a distribution to the company.

The district court agreed with the company that the restrictive language in the 1959 agreement was intended to meet the "exclusive benefit" requirement for qualification of the plan under section 401(a) of the Internal Revenue Code. The court also agreed with the company that this was "standard pension language mandated by the Internal Revenue Code." 604 F.Supp. at 892. It was significant, in the view of the district court, that "until May 1982, the Plan had no provision for dealing with any post-termination surplus." *Id.* at 891. The district court held that the "exclusivity language of the sections relied upon by plaintiffs must be read in light of the ERISA provisions that mandated it," and concluded that "[t]hose provisions [sections 5.3 and 13.1 of the 1959 plan] have never prohibited reversion of actuarial error to the employer...." *Id.* at 892. On this basis the district court determined that neither the original nor the amended language barred reversion of the surplus funds to the company.

The district court relied principally on two district court decisions involving the right of employers to recapture excess funds in pension trusts. *In re C.D. Moyer Co. Pension Trust*, 441 F.Supp. 1128 (E.D. Pa.1977), *aff'd without opinion*, 582 F.2d 1273 (3d Cir.1978), concerned a plan that originally limited the employer's right to amend the agreement as follows:

It shall, however, at all times be impossible, if any alteration, amendment or revocation be made pursuant to this provision, for any of the trust corpus or income to be diverted to or revert to either of the employers or to be used for any

purpose other than the exclusive benefit of the participants or their beneficiaries. The plan was amended after enactment of ERISA to provide for return of assets to the employer that resulted from actuarial errors. The court found that at the time the fund was created "trust corpus or income" included "only so much of the funds as were necessary to insure full payment of the plan's obligations to the participants." 441 F.Supp. at 1132. The *Moyer* court found that the parties had not contemplated that there would be a surplus, and that to award the surplus to participants who had already received their prescribed benefits in full would bestow an unwarranted windfall. As a matter of policy, the court felt that employees would be better protected by a rule that did not penalize employers for overfunding pension trusts.

The court in *Washington-Baltimore Newspaper Guild v. Washington Star Co.,* 555 F.Supp. 257 (D.D.C.1983), *aff'd without opinion,* 729 F.2d 863 (D.C.Cir.1984), reached the same result as in *Moyer.* Prior to 1976 the trust agreement involved in *Washington Star* provided that in the event the plan was terminated "[n]o part of the Trust Fund shall ever revert to the company or inure to its benefit prior to satisfaction of all liabilities to employees under the Plan." In 1976 the plan was amended to provide that "no amendment shall divert the Trust Fund as then constituted, nor any part thereof to a purpose other than for the exclusive benefit of employees covered by the Plan or their beneficiaries." 555 F.Supp. at 258. The 1976 amendment also dealt with termination and provided if that occurred, no part of the trust fund could be "returned to the Employer or be used for, or diverted to, purposes other than for the exclusive benefit of employees covered by the Plan or their beneficiaries." *Id.* at 259. The district court upheld the validity of the 1981 amendment that provided for return to the employer of "any assets remaining in the Trust Fund after the full satisfaction of all liabilities of the Plan to participants and their beneficiaries...." *Id.*

We conclude that neither *Moyer* nor *Washington Star* compels the result reached by the district court in this case.

## III.

Two statements in the district court opinion in the present case are not supported by the record. The court stated that the "exclusivity language" of sections 5.3 and 13.1 of the 1959 agreement must be read in light of the ERISA provisions that mandated it. Since ERISA was enacted in 1974, it clearly mandated nothing with respect to the 1959 agreement. Presumably the district court intended to refer to the requirement of the Internal Revenue Code rather than ERISA. At an earlier place in the opinion, the district court had referred to language "mandated by the Internal Revenue Code," and we assume the later reference to ERISA was a misstatement. More puzzling is the statement, "[t]hose provisions have never prohibited reversion of actuarial error to the employer...." 604 F.Supp. at 892. Perhaps the district court accepted the *Moyer* court's view that the trust estate included only so much of the funds contributed as were necessary to provide guaranteed benefits and this statement referred to the particular clauses within sections 5.3 and 13.1 that used the words "exclusive benefit." However, this treatment ignores other language in the two sections that clearly does prohibit reversion. It is the other language that the plaintiffs rely upon, and neither the company nor the district court has answered their arguments with respect to that language.

The language referred to by the plaintiffs is not "standard pension language mandated by the Internal Revenue Code." To the contrary, it goes far beyond the requirements of 26 U.S.C. § 401(a):

*In no event and under no circumstances shall any contributions* to this Trust by the Employer, nor any of the Trust Estate or the income therefrom revert to or be repaid to the Employer.

Section 5.3 (emphasis added). This language treats contributions of the employer

and the principal and income of the trust separately and forbids reversion of either.

 Unlike any other plan referred to in this record or in the cited cases, this pension plan assured the participating employees that, once contributed, no money paid into the fund could ever be reclaimed by the company. The company responds that the limitation on amendments referred only to diverting the trust estate, and there was no prohibition against an amendment deleting the reference to contributions. This argument overlooks the absolute language of section 5.3: "In no event and under no circumstances...." This language in itself precludes an amendment that would allow money once contributed to be reclaimed. An agreement that provides that an act can occur in no event and under no circumstances cannot be converted into one that permits the act by a series of amendments that first deletes the reference to the prohibition and then adds a provision permitting the forbidden act. Even if a surplus from actuarial error might properly be considered not to be a part of the trust estate, nevertheless, the surplus assets did originate as "contributions" to the trust.

Each case of this kind is controlled by the language of the documents creating the particular plan involved. While the language in *Moyer* limiting the power of the employer to amend the plan was similar to that in the present case, the *Moyer* agreement made no reference to the return of contributions. The limitation on amendments in the *Washington Star* plan did nothing more than prohibit diversion to any purpose other than for the exclusive benefit of participants. See also *Pollock v. Castrovinci*, 476 F.Supp. 606, 612 (S.D.N.Y.1979), *aff'd without opinion*, 622 F.2d 575 (2d Cir.1980), ("no ... amendment shall enable [the employer] to recover or divert from the exclusive benefit of the Participants the fund already deposited in the Trust."). None of these cases involved language similar to that found in section 5.3 of the 1959 agreement.

It is reasonable to conclude that limitations on the power to amend that go no further than required by the Internal Revenue Code to guarantee that the trust fund will be preserved for the exclusive benefit of participants were intended to do no more than that. However, the unequivocal prohibition against recapture of any contributions to the fund sets this case apart. It cannot be assumed that the intent was anything other than that expressed in the agreement itself. This conclusion is buttressed by language in a handbook distributed to all employee participants in the International Trust pension plan:

> Funds paid into the trust can never be refunded to the Company and are for the exclusive benefit of the employees under the Trust.... It is definitely provided that the funds paid into the Trust are for your exclusive benefit and can never, under any circumstances, revert to the Company.

While the handbook is not a part of the plan agreement and cannot be relied upon to modify or affect any provision of the plan, it does provide an indication of intent. The "exclusive benefit" guarantee described in the handbook is not limited to the funds in the trust that may be required to pay prescribed benefits. Rather, all funds *paid into* the trust, that is, all contributions, are for the exclusive benefit of participants and their beneficiaries. The record before us contains no evidence of a contrary intent.

We do not believe this decision will result in a windfall for the plaintiffs. The plan was designed to provide some financial security for the employees, all of whom lost their jobs when the company ceased operations shortly after terminating the pension plan. On the other hand, permitting the company to recapture its contributions to the fund might well result in a windfall. The company was entitled to deduct its contributions to the pension trust for income tax purposes. Under the present law, there appears to be no income tax on the reversion of pension fund assets even though the payments which created the surplus are deductible. See *Mertens Law*

*of Federal Income Taxation,* § 25B.13, of the January 1986 Cum.Supp., p. 36. (President Reagan's proposed tax reform would impose a 10% excise tax on plan funds reverting to the employer for plan terminations after January 1, 1986.).

The judgment of the district court is reversed and the case is remanded for further proceedings. The district court will fashion an equitable allocation of the excess funds among the participants and their beneficiaries. The plaintiffs will recover their costs on appeal.

WELLFORD, Circuit Judge, dissenting.

The issue in this case is a troubling one. Appellee, the employer contributor to an ERISA plan, seeks a return of its excess contributions to the plan after *full satisfaction* of all amounts due the employee participants in the plan. The latter, appellants in this case, seek the excess remaining in the plan representing contributions due to an actuarial miscalculation. The employer provided in the original plan, before amendment, that in no event would contributions revert to it. If successful, the employees would receive, in effect, a windfall toward which they made no payment and had no reasonable basis for expectation.

I find three cases affirmed without opinion by other circuits to be persuasive authority for the employer's position, indicating that an affirmance of the district court's decision would be appropriate.

The first case, *In re C.D. Moyer Co. Trust Fund,* 441 F.Supp. 1128 (E.D.Pa. 1977), *aff'd without opinion,* 582 F.2d 1273 (3d Cir.1978)[1] also involved an employer funded pension plan providing for fixed participant employee benefits. The plan, not a part of a collective bargaining agreement, permitted amendments but was limited to make it *"impossible ... for any of the trust corpus or income to be diverted to or revert to either of the employers or to*

be used for any purpose other than the *exclusive benefit* of the participants...." 441 F.Supp. at 1131 (emphasis added). The employer, despite this language, amended the plan when, upon proposed termination, it was learned that there was a substantial surplus in the plan above and beyond the fixed benefits provided for all participants. The amendment provided for refund to the contributing employer of the surplus assets due to "erroneous actuarial computations," *id.,* after full satisfaction to eligible employees. The court held that since it was not intended that there be excessive contributions due to actuarial miscomputation, a "mistake of fact," the employer's action was appropriate, and it could recover its mistaken excessive payments or contributions. Reference was made to Revenue Ruling 77–200 which permitted such employer actions despite both ERISA and I.R.C. "general prohibitions against diversion of assets" to employers under qualified plans. The court noted that this would not "penalize" a fully funding employer nor provide a "windfall" to employees "as a result of miscalculation." *Id.* at 1133.

The second case, *Pollock v. Castrovinci,* 476 F.Supp. 606 (S.D.N.Y.1979), *aff'd without opinion,* 622 F.2d 575 (2d Cir.1980), involved an ERISA pension plan in which the employer made all contributions with a fixed formula for employee benefits. The plan did not provide expressly for employer recapture of excess contributions made beyond the amount necessary to provide for full specified employee benefits, and it contained the following provision:

> The employer shall have power to amend the terms of this Plan in any way provided that no such amendment shall enable it to recover or divert from the *exclusive benefit of the Participants* the fund already deposited....

476 F.Supp. at 612 (emphasis added). The employer, nevertheless, amended the plan to provide that excess contributions would

---

1. The continuing vitality of *Moyer* is somewhat questionable in light of *Delgrosso v. Spang & Co.,* 769 F.2d 928 (3d Cir.1985). The latter case involved a collectively bargained for pension plan and contractually required contribution,

and an amendment providing for reversion without any such amendment authority in the employer. The Third Circuit, however, itself distinguished the factual situation in *Delgrosso* from *Moyer.*

be distributed back to the employer. The court held that this did not violate ERISA principles, and like *Moyer,* was in accord with equitable principles under the circumstances. It cited another similar case allowing a retroactive amendment for reversion of excess plan assets to a contributing employer, *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.,* No. 78–0623–12 (E.D.Va. Dec. 12, 1978).[2]

The third case, *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co.,* 555 F.Supp. 257 (D.D.C.1983), *aff'd without opinion,* 729 F.2d 863 (D.C. Cir.1984) involved yet another similar factual situation under ERISA. The employer amended the plan to provide for reversion of excess pension plan trust assets to the employer after full satisfaction of plan benefits to employee participants despite the following language:

> ... no amendment shall divert the Trust Fund, as then constituted, nor any part thereof, to a purpose other than for the *exclusive benefit* of employees covered by the Plan....

555 F.Supp. at 258 (emphasis added). *Washington Star Co.* cited with approval *Pollock* which allowed reversion to the employer under like circumstances in accord with "the common law of trusts," I.R.C., and "policies underlying the enactment of ERISA." 555 F.Supp. at 260. Again, it was emphasized that non-contributing employees had no right to the extra benefits in the situation where the employees had received the full specified benefits; more than this would constitute a "windfall." 555 F.Supp. at 265.

I am therefore disposed under the authority of these cases to affirm the district court decision, particularly with regard to the language set out in Section 13.1 of the Plan. If the language in Section 5.3 were construed to preclude the amendment and subsequent reversion to the employer, I would hold that the excess contributions should, nevertheless, not go to the employees as an undeserved windfall due to an actuarial miscalculation. Rather, I would hold that the excess contributions should be distributed to the Pension Benefit Guaranty Corporation which is charged with enforcing the responsibility under ERISA of providing employees generally the vested and/or specified benefits called for under employer pension plans.

### ORDER

Upon receipt and consideration of the petition for rehearing filed herein by the defendants-appellees, the court concludes that it did not overlook the fact that the company amended the pension plan in 1976. To the contrary, this amendment was discussed at page three of the opinion. Further, the opinion did not hold that the appellee had not paid income tax on the recovered surplus from the pension trust. The opinion merely stated that there was no apparent requirement under the Internal Revenue Code for reporting this recovery as income and cited a proposed change in the Code to make certain that such recovered funds are taxed.

The petition for rehearing is denied.

Judge Wellford dissents.

---

**2.** *Audio Fidelity* was reversed by the Fourth Circuit at 624 F.2d 513 (1980). The latter decision was distinguished in *Washington-Baltimore*

*Newspaper Guild v. Washington Star Co.,* 555 F.Supp. 257, 262.