Peter UNITIS, Martin Brennan, Edward Hauser, Frank Jallits, John Traygar, Fred Daniels, Claud Jackson, and others similarly situated, and United Steelworkers of America, AFL–CIO–CLC, Plaintiffs,

v.

JFC ACQUISITION COMPANY (or Jernberg Forgings Company), Jernberg Forgings Company Pension Plan, and Jernberg Forgings Company Retirement Committee, Defendants.

No. 85 C 10173.

United States District Court,
N.D. Illinois, E.D.

Sept. 8, 1986.

Joy E. Klopp, Pittsburgh, Pa., William H. Schmelling, Chicago, Ill., for plaintiffs.

Stephen M. Slavin, Bennett L. Epstein, Andrew Sears, Coffield, Ungarett, Harris & Slavin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action under Section 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132, and Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, is before the court on several motions. Defendants JFC Acquisition Company, Jernberg Forgings Company Pension Plan, and Jernberg Forgings Company Retirement Committee have moved for summary judgment, to strike the plaintiffs' jury demand, and to strike the plaintiffs' prayer for punitive damages. Plaintiffs have moved for class certification and for partial summary judgment on the question of liability. This latter motion has also sparked some procedural motions regarding the stay of discovery and the propriety of this court's taking judicial notice of the record supporting a recent decision of the Third Circuit Court of Appeals. For the reasons set forth herein, the plaintiffs' motions for partial summary judgment, for judicial notice of the Third Circuit record, and for class certification, are granted, and the defendants' motions to strike the jury demand and to strike the prayer for punitive damages are granted. All other pending motions are denied.

### Facts

Defendant JFC Acquisition Company ("JFC") is a successor in interest to Jernberg Forgings Company ("Jernberg"), and administers the defendant Jernberg Forgings Company Pension Plan ("Plan") through the defendant Jernberg Forgings Company Retirement Committee. Plaintiffs Peter Unitis, Martin Brennan, Edward Hauser, Frank Jallits, John Traygar, Fred Daniels and Claude Jackson are all former or active employees of JFC or its predecessor and seek to represent a class of all former or present participants in the Plan. Plaintiff United Steelworkers of America ("Steelworkers") is the collective bargaining representative for the plaintiffs.

This suit arises out of JFC's decision in the summer of 1985 to amend the pension plan and terminate the fund for purposes of recovering approximately $2,000,000 in excess funding. The over-funding resulted from actuarial error in the negotiation of cents-per-hour contributions prior to 1983. Plaintiffs allege that the amendment and proposed termination constitute a breach of fiduciary duty under ERISA and a violation of both the Plan documents and the Collective Bargaining Agreement between JFC and plaintiff Steelworkers.

Prior to 1983, the collective bargaining agreements between Jernberg and its employees required funding of the pension plan through negotiated cents-per-hour contributions, and provided pension benefits based upon a dollar factor multiplied by years of service. The fixed contribution level increased steadily over the years from .245 in 1970–71 to .5875 cents per hour in 1981–1982. No employees are required or allowed to make contributions to the Pension Fund under these agreements, and prior to 1976 the plan agreements expressly prohibited reversion of assets to

456

the Company: "The contributions made by the Company hereunder may not under any circumstances revert to the Company." The agreements provided for allocation of benefits upon termination, but did not specify what to do in the case of excess funding. The agreements also gave no express amendment power to the Company.

In November 1976, the Company reformulated the Plan with Union approval. The new plan, which was incorporated into the Company's Union agreement, contained the following provisions regarding reversions:

§ 1.1 ... Upon the transfer by the Company of any funds to the Trust Fund in accordance with the provisions of this plan, all interest of the Company therein shall cease and terminate and, except as provided in Section 7.3, no part of the Trust Fund shall be used for or diverted to purposes other than for the exclusive benefit of Participants and their beneficiaries as herein provided.

§ 7.3 *Reversion to the Company.* Except where a contribution to the Trust is made by the Company through a mistake of fact, the funds transferred to the Trust pursuant to the provisions of the Plan shall be used for the exclusive benefit of the Participants and there shall be no reversion of contributions to the Company.

Section 10.4 of the 1976 plan gave the Company amendment authority, but provided that

No such amendment shall operate either directly or indirectly to give the Company any interest whatsoever in any funds or property held by the Trustee under the terms hereof, or to permit corpus or income of the Trust to be used for or diverted to purposes other than the exclusive benefit of persons who are at any time on or after the date hereof employees of the Company and the beneficiaries of such persons, except as provided in Section 7.3.

Section 9.1 of the Pension Plan states that a Trust Fund has been established for purposes of the Plan, and that the assets of the Trust will "be held, invested and disposed of by the then acting Trustee in accordance with the terms of the Trust for the benefit of the Participants and their beneficiaries." The Trustee's responsibilities are limited by what is contained in the trust agreement. The Pension Trust was entered into on April 14, 1977 between Jernberg and Continental Illinois Bank as trustee, and provides in Article IV that:

No part of the corpus or income of the Trust Fund shall revert to the Company or be used for, or diverted to, purposes other than for the exclusive benefit of Participants or their Beneficiaries, provided, however, that:

.    .    .    .    .

(c) If, after all liabilities of the Plan to Participants and their Beneficiaries have been satisfied, any residual assets remain, such assets shall be returned to the Company.

The Pension Agreement was finally ratified by the Union in September 1977 and was reaffirmed by the parties through November 1982. It appears that the Trust Agreement between Jernberg and Continental was not discussed at any of these negotiations. In 1983, the Company discovered through its actuaries that the Plan was substantially overfunded according to the level of promised benefits, and the parties amended the Pension Plan to relieve the Company from the obligation of making contributions unless independent actuaries determined that the Internal Revenue Code required additional contributions. Thereafter, neither Jernberg nor JFC as its successor has made any contributions to the Pension Fund.

The 1983 agreement continued the anti-reversionary language of the 1977 agreement with some modification:

§ 7.3: The Company has no beneficial interest in the Trust Fund and no part of the Trust Fund shall ever revert or be repaid to the Company, directly or indirectly, except that the Company, shall, upon written request, have a right to recover within one year of the date of

payment a contribution by the Company, any amount (less any losses attributable thereto) contributed through a mistake of fact.

The amendment language prohibiting the company's acquisition of any interest in funds or property held by the Trustee remained the same.

In February 1985, JFC purchased the assets of Jernberg Forgings Company, continued its operations uninterrupted, and adopted the 1983 Pension Plan Agreement and collective bargaining agreement. In July 1985, JFC learned through its actuaries that the Pension Plan had assets of $3,623,094, or approximately $2,000,000 more than was needed to fund all benefits owed to participants. JFC unilaterally amended the Pension Plan to provide that "[u]pon complete termination of the Plan and the allocation and distribution of the Trust Fund as provided herein, any Funds remaining in the Trust Fund after the satisfaction of all fixed and contingent liabilities under the Plan shall revert back to the Company." The Union protested the action, but the company adhered to its view that the amendment was legal. JFC terminated the original plan, instituted a new plan, and made necessary filings with the Pension Benefit Guaranty Corporation ("PBGC") describing the proposed distribution. This suit followed.

## Cross-Motions for Summary Judgment

■ Plaintiffs' amended complaint contains three distinct claims. In Count I of their complaint, they allege that the Company violated ERISA § 404(a)(1)(D) of ERISA which requires a fiduciary of a plan to discharge its duties "in accordance with the documents and instruments governing the plan." In Count II of their complaint, plaintiffs allege that, by intending to use the residual assets of the Pension Trust Fund for the Company's benefit, defendants breached their statutory obligation to administer the Plan for the "exclusive benefit" of Plan employees and beneficiaries. Finally, in Count III of their complaint, plaintiffs allege that the amendment breached the collective bargaining contract

in violation of Section 301 of the LMRA because the Pension Plan forbidding the amendment was made part of the 1983 agreement between the Company and the Union.

The propriety of ERISA fiduciaries recovering residual plan assets has been set forth in several published opinions which the parties have exhaustively and intelligently analyzed. The first of these decisions, *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd without opinion*, 582 F.2d 1273 (3d Cir.1978), concerned an application by the Pension Benefit Guaranty Corp. for appointment of a trustee to acquire and distributed $90,000 excess remaining in the defendant's Pension Trust after satisfaction of all liabilities. The plan in question authorized the employer to amend the pension agreement, but provided that in no case could such an amendment provide "for any of the trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefit." *Id.* at 1131. Despite this language, the employer amended the plan to provide that, upon termination and satisfaction of all liabilities, the employer could recover excess assets resulting from actuarial error.

The district court noted that the language regarding the amendment power tracked the "exclusive benefit rule" of ERISA. That rule prohibits diversion of pension funds to an employer but expressly allows residual assets of a defined benefit fund to revert to the employer if all liabilities of the plan have been satisfied and the plan documents permit the reversion. *See* § 4044(d)(1) of ERISA, 29 U.S.C. § 1344(d)(1). The court noted that the employer was obligated to pay into the trust only so much money as was necessary to ensure full payment of the defined benefit levels, and that the overfunding resulted from payments in excess of that contractual requirement. Accordingly, the court concluded that the phrase "trust corpus or income" referred to only that portion of the fund resulting from contributions which

the employer was obliged to make, and that the excess lawfully belonged to it.

*Moyer* was then followed in *Pollock v. Castrovinci*, 476 F.Supp. 606, 612–13 (S.D. N.Y.1979), *aff'd*, 622 F.2d 575 (2d Cir.1980), and *Washington-Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 555 F.Supp. 257 (D.D.C.1983), *aff'd without opinion*, 729 F.2d 863 (D.C.Cir.1984). In *Washington Star*, the original plan documents provided that, in the event of termination, no part of the Trust Fund would revert to the company prior to satisfaction of all liabilities to employees. In 1976, following the passage of ERISA, the company amended the plan to provide that upon termination, the trustees would pay all obligations, distribute the balance, and that "in no event shall any of the Trust Fund ... be returned to the Employer...." In July of 1981, the Star announced the closing of the newspaper, and the trustees amended the above section to provide that the residual assets remaining after full satisfaction of liabilities would be returned to the employer. Again, as in *Moyer*, the court interpreted the contractual language in tandem with the exclusive benefit rule of ERISA and found that the language limiting the amendment power was mere boilerplate intended to signify the employer's statutory obligations but not to override the § 4044(d)(1) exception allowed under ERISA. The court also relied on language in the plan expressly limiting the rights of participants in the assets of the Fund to the extent of the benefits payable to that participant.

*Moyer*, *Washington Star*, and *Pollock* all concerned "defined benefit plans" in which the levels of employee benefits were set by a formula rather than by the amount contributed to each participant's account, and in which the employer's contribution obligations were limited to the amounts deemed actuarially necessary to ensure payment of the defined benefit levels. In *Delgrosso v. Spang and Co.*, 769 F.2d 928 (3d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986), the Third Circuit distinguished *Moyer* and its progeny where the plan in issue required

the employer to contribute .40 per hour worked for each employee and entitled the employee to as much pension as the Fund could buy once he retired. 769 F.2d at 930. In that case, the employer had in 1974 converted its defined contribution plan to a defined benefit plan and thereafter made no further contributions. The plan in question prohibited the reversion of "contributions" to the Company under any circumstances and provided that neither the Company nor the participants would have any right, title, or interest in or to the trust funds except as specifically provided, and directed, in the event of termination, for all remaining assets after deductions of reserve to be prorated among participants.

In 1983, Spang incorporated a new plan to remove the prohibition against reversion so that actuarial surpluses could be recovered by the company and to limit the allocation of remaining assets by the extent of accrued benefits. The Court of Appeals held the amendments unlawful. The Court questioned the reasoning of *C.D. Moyer* and *Washington Star*, but then distinguished the cases on the factual ground that Spang's contributions were made pursuant to a defined *contribution* agreement: "Unlike the employers in *Moyer* and *Washington Star*, who paid more into the funds than ultimately proved necessary and who then sought refunds of overpayments, Spang here seeks the return of those monies which it was contractually required to pay into the Fund as deferred compensation for its employees." 769 F.2d at 935. The Court also noted that Spang had never been given authority to amend the pension agreement and therefore breached its fiduciary duty by failing to administer the plan in accordance with the governing documents. The court specifically distinguished the language prohibiting reversion of all *contributions* from the anti-reversion language of *Moyer* and *Washington Star*.

This latter distinction was again drawn in *Bryant v. International Fruit Products Co., Inc.*, 793 F.2d 118 (6th Cir.1986). In that case, the company in 1959 adopted a

defined benefit plan under which the employer was required to make sufficient contributions to guarantee the payment of assured benefits. The plan documents specified that "In no event and under no circumstances shall any contributions to this Trust by the Employer, nor any of the Trust Estate or the income therefrom, revert to or be repaid to the Employer...." The plan gave the employer unilateral amendment power but provided that "no such amendment shall cause or permit any part of the Trust Estate to revert to or be repaid to the Employer or be diverted to any purpose other than the exclusive benefit of the participants or their beneficiaries or estates...."

Following the enactment of ERISA, the defendant employer had amended the pension plan in its entirety and restated the limitation on diversion in more restrictive terms. Specifically, the language against reversion of contributions was eliminated so as only to prohibit the diversion of the Trust Fund assets prior to the satisfaction of all liabilities, and the language concerning the amendment power was weakened as well. In 1982, the employer amended the plan to expressly allow for a reversion of excess funds upon termination and declared the fund terminated in order to recapture the surplus assets.

The district court, relying on *Moyer* and *Washington Star*, held that neither the original nor the amended language barred reversion of the surplus funds. The appellate court reversed. The court held that the original 1959 language was not merely "standard pension language" mandated by the Internal Revenue Code as in the other two cases, but that the agreement treated contributions of the employer and the trust corpus separately so as to prohibit reversion of either. 793 F.2d at 122–23. Therefore, even if the surplus assets from actuarial error were not considered to be a part of the trust estate, those assets originated as contributions and could not be appropriated by the employer.

As noted in *Bryant*, "[e]ach case of this kind is controlled by the language of the documents creating the particular plan involved." 793 F.2d at 123. In this case, the language brings the prohibition squarely within the facts of *Bryant* rather than those of *Moyer* and *Washington Star*. Under § 7.3 of the 1976 agreement, there was to be "no reversion of contributions to the Company" except under special circumstances of mistaken fact. That section, moreover, contains both boilerplate "exclusive benefit" language and language barring reversion of contributions. Section 10.4 of the Plan in turn prohibited the Company from using its amendment power not only to use or divert trust corpus or income, but also to acquire, directly or indirectly, "any interest whatsoever in any funds or property held by the Trustee...." Thus, much like the plan in *Bryant*, the Plan in question distinguishes between trust corpus and income on the one hand and "any funds or property held by the Trustee" on the other so as to prohibit reversions of either.

Defendants argue that *Bryant* is not controlling because the 1983 Jernberg Pension Plan did not prohibit reversion of prior contributions, but simply stated that "no part of the Trust Fund shall ever revert or be repaid to the Company." The latter language is alleged to be mere boilerplate invocation of the exclusive benefit rule. Even accepting this argument, however, both the pre-ERISA agreements and the 1976 agreement explicitly prohibited reversion of *contributions*. The latter agreement also precluded defendants from adopting amendments which would operate, either directly or indirectly, to give the company an interest in any funds or property held by the Trustee under the Plan. If defendants are correct that the 1983 agreement by its language does not bar reversion of excess funds, then the 1983 amendments unlawfully operated to give the company an interest in the funds held by the trustee, despite the earlier ban on reversion of contributions. If, on the other hand, the 1983 language precludes reversion, then the 1985 amendments violate the Plan documents by operating to create a reversionary interest in the funds held by

the Trustee. Under either theory, the company would have violated its fiduciary duty to administer the fund in accordance with the Plan documents.

The *Bryant* court's analysis confirms this view. The court in *Bryant* concentrated on the language of the Company's 1959 agreement rather than that of the 1976 agreement in determining the propriety of the employer's actions, thus suggesting that a clear prohibition on reversion of contributions cannot be overridden by later amendments. The court's concentration on the former agreement cannot be chalked up to a mere mistake: the defendants explicitly raised the ground in a petition for reconsideration but were rebuffed. 793 F.2d at 125. Therefore, the court concludes that *Bryant* rather than *Moyer* and *Washington Star* controls the facts of this case.

The court also agrees with plaintiffs that the results in *Washington Star* and *C.D. Moyer* must be distinguished based on the obligatory nature of the contributions made by Fernberg. In *Moyer*, the judge emphasized that the company was contractually obliged only to contribute so much funding as was necessary to maintain the desired benefit levels, and that the excess funds were therefore never properly part of the trust corpus. In this case, however, all of the plan's assets derive from negotiated cents-per-hour contributions. While it is apparent that the cents-per-hour figures were arrived at on an actuarial basis, the crucial fact remains that the contributions were fixed by agreement and therefore part of the trust corpus. As the Third Circuit stated in *Delgrosso*:

> Unlike the employer in *Moyer* and *Washington Star* who paid more into the funds than ultimately proved necessary and who then sought refunds of overpayments, Spang here seeks the return of monies which it was contractually required to pay into the fund as deferred compensation for its employees. No "overabundance of caution" is involved in this case.

769 F.2d at 935.

Defendants have argued that *Delgrosso* is distinguishable because the plan in that case was a "defined contribution plan" within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34), whereas JFC's plan has always provided for defined pension benefits based on a formula and therefore does not meet the statutory criteria of § 1002(34). The language of the *Delgrosso* opinion is unclear, however. The Third Circuit refers to the pension plan at issue as providing for benefits "in the amount of however much pension the Fund could buy once [the participant] retired." 796 F.2d at 930. The Court never refers, however, to the statutory criteria of Section 3(34) and instead appears to concentrate on the obligatory nature of the contributions rather than the nature of the benefits in its discussion.

This impression is buttressed by plaintiffs' factual showing, to which defendants have strenuously objected, that the contracts in question before the court in *Delgrosso* were identical to those of Jernberg before 1983; in other words, the Spang plan set fixed contributions but provided for benefits defined by dollar amounts multiplied by years of service and not by individual account. This evidence strongly suggests that the Third Circuit found the relevant question to be whether the excess funds resulted from self-imposed employer caution or bargained-for cents-per-hour contributions.

The court is not unmindful of defendants' objections to the plaintiffs' submission of the above documents. Were the language or holding of the Third Circuit clearly based on a misimpression, the court would agree that plaintiffs could not use Spang's contracts to demonstrate that the Third Circuit did not mean what it said. Courts typically take judicial notice of pleadings in precedential cases, however, to determine facts which are not clear from the opinion itself as an aid to interpretation. *See, e.g., Commercial Discount Corp. v. King,* 515 F.Supp. 988, 992 (N.D. Ill.1981). The instant case involves such an ambiguity. The court notes, however, that if plaintiffs have in any way misrepresen-

ted the record in *Delgrosso*, defendants would be entitled to reconsideration of this opinion. Since *Delgrosso* does not form the court's sole basis for decision, such a motion would narrow the grounds for decision without changing the results and should only be made if an appeal will be taken. To aid this inquiry, the court suggests that plaintiffs' counsel, who argued *Delgrosso*, make the appellate briefs from that case available to defendants' counsel.

Defendants also argue that *Delgrosso* is distinguishable in that Spang had no amendment power over the plan and the participants had an express right to pro-ration of funds remaining after distribution. The former of these arguments is inconsequential, since this court has found that the amendment power in this case was unlawfully exercised. The latter argument, however, presents a closer issue. *Delgrosso* is undoubtedly an easier case for the beneficiaries because of the entitlement language. The Jernberg plan by contrast simply provides that "Notwithstanding any other provision hereof" upon termination and satisfaction of all liabilities, remaining funds "arising out of variations between actual requirements and expected actuarial requirements ... shall be disposed of as directed by the Committee." Section 10.-6(f). Such language, moreover, dates back to the period when Jernberg used a fixed cents-per-hour contribution method. Section 10.6(f) does not say, however, that the distribution can be made to the company, and appears instead simply to give the Committee allocation discretion beyond the terms otherwise set forth in the termination provisions. Despite the "notwithstanding" language, the subsection must be read in conjunction with plan provisions expressly prohibiting reversion, and cannot be interpreted to negate all other substantive provisions of the plan documents.

More troublesome than the § 10.6(f) termination provisions is the paragraph in the Trust documents expressly directing that excess assets resulting from actuarial mistakes be returned to the employer upon termination and satisfaction of all liabilities. This document would seem to indi-cate that the company believed the ban on reversions not to extend to such excess assets. The problem with relying on the Trust documents, however, is that they were not negotiated with the Union. While the collective bargaining contract refers to the trust agreement, the reference is only fleetingly made with regard to the obligations of the Trustee, not those of the Company. It would be inappropriate to allow that privately contracted document to override the Company's collective bargaining obligation to refrain from acquiring an interest in the plan contributions, and no party has argued that the discrepancy between the Trust documents and the bargaining agreements creates a disputed fact which must be resolved by trial. Accordingly, the court finds that partial summary judgment in the plaintiffs' favor is appropriate.

### Motion To Strike Jury Demand

█ In their original and amended complaints, plaintiffs have demanded a jury trial of their claims for a breach of the collectively bargained agreement by defendants' unilateral adoption of the 1985 amendments and seek as relief contract damages equal to the excess assets the Company appropriates. Defendants have moved to strike this demand on the ground that Section 502 of ERISA does not provide claimants with a right to a jury trial, and that plaintiffs have no proper claim for contract damages.

Now that the substantive issues have been resolved on summary disposition, the court need not decide whether the presence of an LMRA claim appended to an ERISA claim is itself enough to justify a jury demand. Under the present posture of the case, the claim for contract damages is the only basis for a jury demand. As the evidence before the court on summary judgment shows, however, JFC has not yet recovered any excess funds from the Pension Plan despite its stated intention to do so, and the relief which can be awarded is thus wholly equitable in nature. Accord-

ingly, the motion to strike the plaintiffs' jury demand is granted.

## Motion To Strike Punitive Damages

■ The individual plaintiffs in this case seek exemplary damages under ERISA's general enforcement powers as set forth in Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). Defendants argue that exemplary damages are not available under ERISA, and that such damages are in any event inappropriate in this case. The court agrees. In *Massachusetts Mutual Life Insurance Co. v. Russell*, —— U.S. ——, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court ruled that neither § 409 nor § 502(a)(2) of ERISA authorize recovery of extracontractual damages. Although the majority opinion reserved the question whether punitive damages could be recovered under § 502(a)(3)'s authorization of "appropriate relief," *id.*, 105 S.Ct. at 3089 n. 5, the logic of the Court's opinion points to a negative answer. The court observed that "there is a stark absence—in the statute [ERISA] itself and its legislative history—of any reference to an intention to authorize the recovery of extra-contractual damages" and found it unlikely that "congress intended 'to authorize other remedies that it simply forgot to incorporate expressly.'" *Id.* at 3093.

Four justices in *Massachusetts Mutual* wrote separately to express their view that the recoverability of punitive damages under § 502(a)(3) should be determined "by ascertaining the extent to which trust and pension law as developed by state and federal courts provide for recovery by the beneficiary above and beyond the benefits that have been withheld...." *Id.* at 3098 (Brennan, J., concurring, joined by Justices White, Marshall and Blackmun). Plaintiffs urge such an approach here, and cite various cases in which fiduciaries were held liable for extra-contractual damages. Defendants, in turn, cite the recent case of *Powell v. Chesapeake & Potomac Telephone Co.*, 780 F.2d 419 (4th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986), in which the court held that punitive damages are generally not recoverable in a beneficiary's action for breach of trust and are therefore not recoverable under § 502(a)(3).

This court agrees with the result of *Powell* but under slightly different reasoning. The authority cited in *Powell* and the cases cited by plaintiffs make clear that exemplary damages may be awarded in breach of trust actions where the trustee's actions constitute an independent tort. In the latter situation, the action becomes one at law, and punitive damages are recoverable to the same extent they would be otherwise. *See, e.g., Powell*, 769 F.2d at 424 (recognizing that some states allow exemplary damages in cases of malice or fraud); *Masi v. Ford City Bank & Trust Co.*, 779 F.2d 397, 400 (7th Cir.1985) (punitive damages recoverable in case of fraud by a fiduciary); *Palmer v. Fuqua*, 641 F.2d 1146, 1161 (5th Cir.1981) (same). *Cf.* A. Scott., *The Law of Trusts*, § 198.1 (1967) (trustee cannot maintain an action at law against trustee absent immediate and unconditional duty to pay money to beneficiary).

In the present case, plaintiffs do not allege in their complaint that defendants acted willfully, fraudulently, or with malice. Nor do the facts as revealed in the cross-motions for summary judgment support such a claim: the defendants took action which many courts, faced with similar facts, have upheld as legal, and this court finds the issue a close one. The defendants also fully advised the plaintiffs of their actions, and the excess assets comprise a "windfall" to whomever receives them. Defendants are therefore under no immediate and unconditional duty to pay the funds over to the plaintiffs. Accordingly, even assuming that punitive damages are recoverable in certain ERISA claims, such an award would be inappropriate in this case.

Plaintiffs suggest that punitive damages constitute a necessary enforcement mechanism in the reversion of assets situation because the employer otherwise loses nothing by attempting to advance its own interests. The court disagrees. Employers

who breach their fiduciary obligations under ERISA in attempting to appropriate residual assets where plan language forbids such appropriation not only lay themselves open to possible liability but can be forced to pay the losing side's legal expenses. Therefore, the ERISA scheme fully deters employers from abusing their fiduciary powers.

Accordingly, the motion to strike the prayer for punitive damages is granted.

### Class Certification

 The final matter pending before the court is the motion of the plaintiffs for an order permitting this action to be maintained as a class action and certifying a class of all persons who are present or former participants in the Jernberg Forgings Company Pension Plan with vested or accrued interests therein. The defendants have indicated neither objection to nor support for this motion. For the reasons set forth herein, the motion for class certification is granted.

Plaintiffs' motion affirmatively satisfies the following requirements under Fed.R. Civ.P. 23(a): 1) the members of the class are sufficiently numerous (approximately 240) that joinder is impracticable; 2) there are questions of law or fact common to the class since the entire case stems from JFC's conduct directed toward assets in which all plaintiffs have an interest; 3) the claims of the representative party are typical of the class; and 4) the plaintiffs are adequate representatives of the class in that they have no interests antagonistic to those of the Plan participants generally and are represented by counsel able to conduct the proposed litigation. The requirements of Rule 23(b)(3) have also been fulfilled since the questions of law common to the members of the class predominate over questions affecting individual members. *See generally Klamberg v. Roth,* 473 F.Supp. 544, 558–59 (S.D.N.Y.1979) (class of seventy beneficiaries certified in action for breach of fiduciary duty and pension agreement).

### Conclusion

The defendants' motion for summary judgment is denied, and the plaintiffs' cross-motion for partial summary judgment is granted. The plaintiffs' motion to take judicial notice of the public record in *Delgrosso* is granted, and the defendants' motion to strike the plaintiffs' reply brief is denied; plaintiffs should, however, provide defendants with copies of the *Delgrosso* record so that defendants can verify the accuracies of plaintiffs' representations about that case. The defendants' motion to strike the plaintiffs' jury demand and prayer for punitive damages is granted, and the plaintiffs' motion for class certification is granted. The defendants' motion to stay discovery, if not moot, is denied.

It is so ordered.