Arnold **CHAIT**, Trustee of Ambassador Insurance Company, Inc. Employees Pension Plan, Appellant,

v.

George K. **BERNSTEIN**, Appellee.

No. 86–5733.

United States Court of Appeals, Third Circuit.

Argued April 9, 1987.

Decided Dec. 18, 1987.

As Amended Jan. 28, 1988.

Reid L. Ashinoff (argued), James S. Kaplan, Michael H. Barr, Ashinoff, Ross & Goldman, New York City, for appellant.

Richard B. Whitney (argued), Susan Z. Haller, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Rosalie Burrows, Eugene M. Haring, McCarter & English, Newark, N.J., for appellee.

Before SLOVITER, BECKER and GARTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This ERISA appeal arises from a dispute between the principal of a hopelessly insolvent property and casualty insurance company and the receiver of that company appointed upon petition of the State Insurance Commissioner. Each party claims the surplus assets of the company's defined benefit pension plan ("the Plan") that remain after payment of vested benefits. After the company sponsoring the Plan entered Chapter 7 liquidation, the receiver in bankruptcy froze the assets of the Plan. The receiver then attempted to amend the Plan so that any surplus assets of the Plan, after payment of accrued benefits to vested employees, would revert to the employer's estate in bankruptcy. The principal sued the receiver for the surplus in the United States District Court for the District of New Jersey claiming that the surplus belongs to him and the other employees of the company whose pension benefits have become vested. The receiver claimed the surplus for the benefit of the company (and its creditors). The district court granted summary judgment for the receiver.

Resolution of the dispute requires that we consider two technical ERISA questions in connection with the winding up of a plan. First, we must decide whether a freeze on the accrual of further benefits (and of the plan's assets) effectively terminates a plan, thereby preventing subsequent plan amendment. Second, and more difficult, we must determine whether the language in a plan providing that all plan assets must be used "exclusively for the benefit" of the plan's beneficiaries precludes an amendment returning surplus assets to the employer. In addressing the second question we must examine the complicated relationship between ERISA § 403 (the "exclusive benefit" requirement) and ERISA § 4044 (the provision for surplus reversion in single-employer plans). We must also grapple with the significance of the "exclusive benefit" language under the facts of this case, in which the vested employees have received all their anticipated benefits and the company is bankrupt.

For the reasons that follow, we answer both of the above-stated questions in the negative, and therefore will affirm the district court's summary judgment grant in favor of the defendant, the receiver in bankruptcy. With respect to the vexing second question, we hold that a vested employee who has fully received his vested benefits cannot rely on the "exclusive benefit" language, standing alone, to prevent an amendment reverting surplus plan assets to the bankrupt company.

## I. FACTS AND PROCEDURAL HISTORY

Arnold Chait, the plaintiff-appellant in this case, was chairman of the board, chief executive officer, and president of the Ambassador Insurance Company, a Vermont chartered property and casualty insurance company. Chait is also a major stockholder of Ambassador Group, Inc., which wholly owns the Ambassador Insurance Company. Defendant-appellee George K. Bernstein is the receiver in bankruptcy of Ambassador, appointed by a Vermont court upon petition of the Vermont Commissioner of Banking and Insurance. Although Bernstein was initially charged with the task of rehabilitating Ambassador, the Vermont Supreme Court has since affirmed an order to liquidate the company. Ambassador has been adjudged in Vermont state court to be insolvent by at least $45.6 million. *See In re Ambassador Insurance Co. Inc.*, 515 A.2d 1074 (Vt.1986).

Ambassador provided its employees with a defined benefit plan, funded entirely by employer contributions.[1] On April 4, 1984, as part of Ambassador's reorganization while in receivership, Bernstein amended the Plan to prevent the accrual of benefits after December 31, 1983. This amendment effectively froze the benefits of the Plan and prohibited any further accrual for the skeleton work force that remained upon reorganization. The effects of this amendment on unvested employees is the subject of a potential separate action between the IRS and Bernstein.

On December 9, 1984, Bernstein amended the Plan to provide for the reversion to Ambassador of all surplus assets—those remaining after all vested benefits had been paid. The surplus assets total approximately $500,000. The parties disagree as to the source of surplus, and to what extent the benefit freeze of April 4, which stripped some employees of unvested accrued benefits, may have enlarged it. Bernstein has asserted, and Chait has not disputed, that only approximately $26,000 of the surplus derived directly from the freeze, which recaptured funds set aside for unvested employees for Ambassador. The record contains actuarial information filed with the Internal Revenue Service that corroborates Bernstein's assertion. *See* Schedule B (Form 5500) filed as required under ERISA § 104.

On December 14, 1984, Bernstein filed a Notice of Termination with the Pension Benefit Guaranty Corporation (PBGC). In May 1985, Chait sued in the district court, as trustee, on behalf of all Plan beneficiaries, attempting to prevent Ambassador from recapturing the Plan's surplus assets. Essentially, Chait argued that the vested employees deserved whatever surplus assets remained in the Plan. In June 1985, Bernstein ordered Chait removed as trustee of the Plan and Chait subsequently challenged Bernstein's order in the district court. The district court did not reinstate Chait as trustee but found that he had standing to sue as a Plan beneficiary even if he were not a trustee. *See* ERISA § 502, 29 U.S.C. § 1132 (1982). Indeed, Chait stands to receive over half the surplus himself should he prevail in this litigation. Chait does not appeal the district court decision as to his standing as trustee and hence we treat him as representing only his own interest in this appeal. The parties stipulated to all relevant facts and cross-moved for summary judgment, which the district court granted in Bernstein's

---

1. At the outset, some specifics about the Plan and some definitions will prove useful. First, a defined benefit plan is one in which the plan is "designed and administered to provide fixed—or 'defined'—benefits to the participants based on a benefit formula set forth in the Plan." *Wilson v. Bluefield Supply Co.*, 819 F.2d 457, 459 (4th Cir.1987). It is different from a defined contribution plan "which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account....", ERISA § 3(34), 29 U.S.C.A. § 1002(34) (West.Supp.1987). *See*

*Delgrosso v. Spang & Co.*, 769 F.2d 928, 929–30 (3d Cir.1985) (distinguishing defined benefit and defined contribution plans).

Second, although ERISA permits plans (both defined benefit and defined contribution) to include employee contribution, the Ambassador Plan was not such a plan. Instead, the Ambassador Plan was funded entirely by the employer. Therefore, Ambassador was solely responsible for maintaining sufficient funds in the pension fund to provide for each vested employee's accrued benefits.

favor, 645 F.Supp. 1092. This appeal followed.

## II. DID THE APRIL 4 FREEZE IN BENEFITS CONSTITUTE A TERMINATION OR PARTIAL TERMINATION PRECLUDING FURTHER AMENDMENT OF THE PLAN?

Chait contends that after the April 4 benefit freeze, no further amendment of the Plan was permissible. He believes that the benefit freeze effected a termination of the Plan, and relies on ERISA § 4044, 29 U.S.C.A. § 1344 (West Supp.1987), for the proposition that upon termination, unless otherwise indicated by the Plan, all surplus assets revert to the employees. Because the benefit freeze occurred on April 4, 1984, before the Plan was amended to include a reversion to the employer, Chait argues that the surplus assets reverted to the employees on that date. Alternatively, Chait argues that even if the Plan did not undergo a full termination, it underwent a partial termination under I.R.C. § 411(d)(3) (1982), and that this partial termination prevented any further amendment of the Plan. At oral argument, Chait apparently abandoned his contention that a full termination had been effected on April 4. Instead, he pursued his alternative argument that a partial termination had occurred which, in and of itself, precluded any further amendment of the Plan.

Bernstein argues that the Plan was not fully terminated until December 19, 1984 when the Receiver filed a notice of intent to terminate with the PBGC, and that until that point he was free to amend the Plan to return surplus assets to the employers. Without debating whether a partial termination occurred, or projecting the possible consequences for unvested employees,[2] Bernstein argues that the tax definition of partial termination has no relevance to the distribution of surplus assets, but only applies to protect the interests of vulnerable unvested employees.

The district court held that the Plan had not been fully terminated in accordance with ERISA. In addition it held that the existence of a partial termination for tax purposes does not control whether such a termination has taken place for ERISA purposes. The court concluded that because no termination had taken place for ERISA purposes, amendment after the April 4 freeze was permissible. We agree. There is no question that had the Plan been terminated under ERISA, Bernstein could not have amended the Plan and the surplus would have reverted to the employees. *See Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513 (4th Cir. 1980). Because, for the reasons that follow, we believe no termination for ERISA purposes occurred on April 4, Bernstein was free to amend the Plan.

■ Although the issues of full and partial termination are linked, it is useful at the outset to distinguish the two. As to full termination, we must look to ERISA itself to determine whether a termination has occurred. Terminations are governed by ERISA § 4041, 29 U.S.C.A. § 1341 (West Supp.1987). That section provides that the plan administrator must file notice of termination with PBGC and await its notice that the plan's assets are sufficient to discharge its obligations. Only upon receiving such sufficiency notice may the plan administrator terminate the plan.[3]

As to the question of partial termination under the tax code, even assuming without deciding that a partial termination has occurred in this case, we do not believe that such a termination foreclosed all further amendments of the Plan. First, the language of ERISA itself indicates that a partial termination for tax purposes pursuant to § 411(d)(3) of the Internal Revenue Code "does not, by itself, constitute or require a termination of a plan under [ERISA]."

---

2. Indeed, the IRS may determine that the April 4 freeze was, for tax purposes, a partial termination vesting benefits in certain unvested employees. *See infra* n. 13.

3. The only other method for terminating a plan, not applicable in this case, involves adoption of an amendment that transforms the plan into an unqualified plan under ERISA. *See* ERISA § 4041(f), *recodified as,* 29 U.S.C.A. § 1341(e) (West.Supp.1987).

ERISA § 4043(b)(4), 29 U.S.C. § 1343(b)(4) (1982) (defining a reportable event under ERISA). Second, by its own terms, the Ambassador Plan, in § 11.04, directs that " 'termination' and 'partial termination,' as used in this Plan, shall have the meaning imparted thereto under ERISA."

Third, our precedent indicates that we are not bound by the § 411 standard for partial termination in deciding whether a termination occurs for ERISA purposes. *See United Steelworkers v. Harris & Sons Steel Co.,* 706 F.2d 1289, 1298–99 (3d Cir. 1983) ("Tax precepts governing 'partial terminations' are intelligible in the context of the limited purposes that they are meant to serve."). *See also Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 150 (3d Cir. 1987) (citing *Harris* for proposition that "facts constituting a partial termination for tax purposes will not necessarily constitute such a termination for ERISA purposes").

Finally, although mindful of our observation that "it is not easy to divine the purpose of § 411(d)(3)," *Bruch,* 828 F.2d at 151, we believe that the purposes and policies of partial terminations under the tax code do not apply in the context of vested employees attempting to gain plan surplus. In relevant part, § 411 provides that a pension plan will qualify for tax exemption (so that the employer's contributions to the plan will be tax deductible when made) only if the plan provides that

> upon its termination or partial termination ... the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable.

I.R.C. § 411(d)(3) (1982). Section 411(d)(3) partial termination addresses the question of when and how certain unvested benefits in a qualified pension plan will be deemed to have vested, due to changes in the plan. In *Harris,* we explained that the purpose of § 411 is to protect employees and assure

that they will not be deprived of their "anticipated benefits." 706 F.2d at 1298. We indicated that the main concern of § 411 was to deter employers from "arbitrarily cutting groups of workers out of existing pension plans" thereby causing "a larger number of employees to forfeit their pension benefits than would be anticipated under actuarial formulas." 706 F.2d at 1298 (citations omitted). The provision, therefore, defines termination for the purpose of vesting certain unvested employee benefits for workers who would otherwise be left out in the cold after a drastic and sudden change in the plan. In our view, it should not be extended to apply to surplus assets, after vested benefits are provided for, in a defined benefit plan.

■ In arguing that § 411 partial termination governs this case, Chait relies on *Amato v. Western Union International, Inc.,* 773 F.2d 1402 (2d Cir.1985), *cert. denied,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986).[4] In *Amato,* the Court of Appeals for the Second Circuit considered whether the elimination of certain early retirement benefits constituted a "partial termination" for the purposes of *vesting* those benefits. The court held that it would accord " 'great weight' to the regulations and rulings of the Internal Revenue Service," 773 F.2d at 1415, and that a partial termination pursuant to § 411 could vest certain benefits in the employees. *Id.* at 1415–16. We find no conflict with *Amato* because it used § 411 precisely the way we read it—to protect the anticipated benefits eliminated by sudden changes in the plan. *Amato* did not use § 411 for the purpose of determining whether the Plan was terminated so as to prohibit any further amendment. Additionally, we note that this court explicitly rejected the approach of the Court of Appeals for the Second Circuit approach towards § 411 terminations. *See Bruch,* 828 F.2d at 150–51 (rejecting the court's approach in *Weil v. Retirement Plan Administrative Committee,* 750 F.2d 10 (2d Cir.1984), upon which *Amato* explicitly relied. *Amato,* 773

---

**4.** Chait also relies on *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.,* 624 F.2d 513 (4th Cir.1980), which we find clearly distin-guishable because the attempted amendment of the plan to return surplus to the employer occurred *after* the plan was fully terminated.

F.2d at 1415). Indeed, we find no authority that holds that a partial termination, effected by a freezing of benefits or dismissal of employees, precludes further plan amendments which do not interfere with the employees' anticipated and calculated rights under a defined benefit Plan. Accordingly, we hold that a termination, for ERISA purposes, did not transpire until December 31, 1984, pursuant to Bernstein's filing with PBGC.[5]

### III. DOES THE PLAN'S LANGUAGE OR THE POLICY OF ERISA PRECLUDE THE DECEMBER 9 AMENDMENT?

#### A.

Chait contends that even if Bernstein could have amended the Plan, this particular amendment, returning surplus

assets to the employer, violated the provisions of the Plan and the policy of ERISA. Chait relies upon the language of the Ambassador Plan requiring that Plan funds be used for the "exclusive benefit of the employees," and argues that even if the Plan were amendable after the April 4 freeze, its specific language prevents Ambassador from recapturing any Plan assets.[6]

At first blush, the Plan might appear to prohibit, by its very provisions, the reversion to the employer of any surplus assets of the Plan. Paragraph 11.02 of the Plan provides that, although the employer may amend the Plan,

> no such amendment shall authorize or permit any part of the funds held under the Plan to be used for or diverted to, purposes other than for the exclusive benefit of the Employees.[7]

---

5. Chait also contends that the partial termination effectuated by the freeze vested the "benefits" of the Plan in the employees pursuant to § 411(d)(3) and that the right to the surplus is one of those "benefits." Bernstein, in addition to noting that Chait raises this question for the first time on appeal, rejoins that the right to the Plan's surplus can in no way be construed as a "benefit accrued to the date of termination" within the meaning of § 411(d)(3). Bernstein argues that the surplus in the Ambassador Plan cannot rightfully be regarded as an anticipated benefit that had accrued on the employees' behalf. *See infra* typescript at p. 23. In addition, Bernstein notes that under § 11.04 of the Plan, even if a partial termination had occurred, the only consequence could be the vesting of an individual's benefits as defined and calculated under the Plan's formula. Furthermore, Bernstein contends that we must reject Chait's argument because it proves too much. Section 4044 of ERISA, 29 U.S.C. § 1344, which explicitly provides for the reversion of surplus plan assets, would be rendered meaningless if Chait were correct in his assertion that surplus assets constitute a benefit under § 411(d)(3). Under Chait's reasoning, no plan, however specifically worded, could ever be assured the return of the surplus to the employer because any partial termination would turn such surplus into a "benefit" under § 411(d)(3) for the employees. Bernstein argues that the better reading of § 411(d)(3) therefore interprets the "benefits" of § 411(d)(3) as the employer's anticipated liabilities to the employees under the plan. *See Wilson v. Bluefield Supply Co.,* 819 F.2d 457, 464 (4th Cir.1987) (discussing § 4044(d)(1) and distinguishing residual assets from defined benefits); *Wright v. Nimmons,* 641 F.Supp. 1391,

1405–06 (S.D.Tex.1986) (discussing § 4044(d)(1) and distinguishing excess assets from benefits).

Although Bernstein's substantive arguments are quite forceful, the day is carried by his primary argument that this issue was not raised before the district court. Hence, we do not address it. *See Neal v. Secretary of the Navy,* 639 F.2d 1029, 1035 (3d Cir.1981) (discussing this courts establish "practice that precludes consideration of issues raised for the first time on appeal"). *Caisson Corp. v. Ingersoll–Rand Co.,* 622 F.2d 672, 680–81 (3d Cir.1980) (when an issue has not been raised before the district court, the court of appeals will not consider it absent special circumstances) (*citing Newark Morning Ledger Co. v. United States,* 539 F.2d 929 (3d Cir.1976)).

6. Bernstein submits that Chait did not raise this issue in the district court and is therefore prohibited from raising it in this forum. Although Chait has sharpened this argument before us, we nevertheless find that the issue was sufficiently raised in the district court to warrant our consideration.

7. Slightly stronger language appears in the Plan summary booklet that employees received. The booklet explained in its question and answer format:
   *Can The Plan be changed?*
   The Plan Sponsor intends to continue this Plan indefinitely, but necessarily reserves the right to modify, suspend, or discontinue it at any time. If the plan is discontinued for any reason, however, all contributions made under it must be used exclusively for the benefit of the Participants and their Beneficiaries. The booklet's reference to "all contributions" seems more specific than the Plan's description

Essentially, we must determine whether this clause in the Plan, which Bernstein dubs "ERISA boilerplate," in and of itself disallows reversion of surplus assets to the employer. In construing the language of the Plan we are mindful of our admonition in *Harris* to avoid " 'the not uncommon error of reading technical pension language as if it were ordinary English speech.' " 706 F.2d at 1297 (quoting *Riley v. MEBA Pension Trust*, 570 F.2d 406, 408–09 (2d Cir.1977).

In our view, the inclusion of the "exclusive benefit" language, standing alone, cannot be read to indicate that the Plan prohibits surplus reversion to the employer. This clause, upon which Chait relies, is standard language that appears in every ERISA plan. Section 403(c)(1) of ERISA provides:

> Except as provided ... under section 4042 and 4044 (relating to termination of insurance plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

The language of the Ambassador Plan does not, therefore, represent a unique expression of its designers' desire to mandate that every penny, even amounts in excess of accrued benefits, must revert to employees. Rather, the Plan merely rescribes the standard language of ERISA.[8] Unquestionably, had the Plan included more specifically tailored, emphatic, or original language concerning reversion to the employ-

er, we would be faced with a much more difficult case.

It is important to note that ERISA explicitly allows reversion to employers of plan surplus. The exclusive benefit language of § 403, cited above, upon which the Ambassador Plan relies, makes specific exception for § 4044 reversions to employers, the very type of surplus reversion at issue in this case. Section 4044(d)(1) outlines the circumstances under which employers may recapture surplus assets of a single-employer plan. Section 4044(d) provides in relevant part that

> (1) Any residual assets of a single-employer plan may be distributed to the employer if
>
> (A) All liabilities of the plan to participants and their beneficiaries have been satisfied
>
> (B) The distribution does not contravene any provision of law, and
>
> (C) The plan provides for such a distribution in these circumstances.

29 U.S.C. § 1344 (1982). Thus, the text of ERISA itself demonstrates that the "exclusive benefit" language of ERISA § 403 is not at odds with reversion of the surplus of a single employer plan under § 4044(d)(1)(C).

Because, as we held above, Bernstein's amendment of the Plan providing for reversion of the surplus to Ambassador was timely and permissible, he simply conformed the Plan to provide for such a reversion consistent with § 4044(d)(1)(C). To hold otherwise would prevent an employer from ever amending a plan to revert the surplus to itself. Such a holding would

---

of "all funds held under the Plan." One could argue that only the funds necessary to cover the defined benefits constitute "funds held under the Plan" but that "all contributions" must logically include the surplus. Because Chait failed to raise this argument and at all events because the Plan summary language seems aimed at complying with necessary "exclusive benefit" language, we do not find the language of the summary dispositive. The Plan summary language might possibly be relevant in aiding our prediction of the reasonable anticipations of plan beneficiaries. However, as we discuss *infra* at 1027, the beneficiaries of the defined benefit plan reasonably anticipated only their calculated benefits under the Plan.

**8.** As further evidence that the "exclusive benefit" language is standard plan fare with little independent significance, we note that § 401(a)(2) of the Internal Revenue Code, IRC § 401(a)(2) (1982) (requirements for qualification), mandates that

> under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be ... used for, or diverted to, purposes other than for the exclusive benefit of [the employer's] employees or their beneficiaries.

*Id.*

inflict internal inconsistency into ERISA law because the source of the very language that would limit such a reversion (the exclusive benefit language of § 403) expressly recognizes surplus reversion to an employer as a valid exception to its rule. *See Washington–Baltimore Newspaper Guild v. Washington Star Co.*, 555 F.Supp. 257, 261–62 (D.D.C.1983); *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128, 1132–33 (E.D.Pa.1977).[9]

## B.

Many courts have struggled with questions concerning this standard, mandatory "exclusive benefit" clause in ERISA plans. The prevailing view regards the "exclusive benefit" language, standing alone, as insufficient for preventing reversion of plan surplus.[10] *See Washington–Baltimore Newspaper Guild v. Washington Star Co.*, 555 F.Supp. 257, 261 (D.D.C 1983), *aff'd mem.*, 729 F.2d 863 (D.C.Cir.1984) (plan language that "merely paraphrases ERISA's exclusive benefit rule" does not prohibit any surplus reversion to the employer); *Wright v. Nimmons*, 641 F.Supp. 1391, 1406 (S.D. Tex.1986) ("the better reasoned position is that the 'exclusive benefit' rule *standing alone* does not preclude an amendment which specifically directs the distribution of excess assets to the corporation in appropriate circumstances") (emphasis in original); *Pollock v. Castrovinci*, 476 F.Supp. 606, 612–13 (S.D.N.Y.1979) (allowing reversion despite a plan provision that "no such amendment shall enable [the employer] to recover or divert from the exclusive benefit of the Participants the fund already deposited in the Trust"); *In re C.D. Moyer Co. Trust Fund*, 441 F.Supp. 1128, 1131 (E.D. Pa.1977), *aff'd mem.*, 582 F.2d 1273 (3d Cir.1978) (holding that Plan prohibiting

amendment that would permit "trust corpus or income to be diverted to or revert to either of the employers or to be used for any purpose other than the exclusive benefit of the participants, or their beneficiaries" did not prohibit reversion of surplus to employer because the term "trust corpus or income" only applied to those assets necessary to insure full payment of Plan obligations).

In reviewing the jurisprudence of the various appellate courts, we have found no court that prohibited a reversion of surplus assets in a defined benefit plan based on the "exclusive benefit" language alone. For example, in *Bryant v. International Fruit Products Co.*, 793 F.2d 118 (6th Cir. 1986), the court relied on the additional language of the plan: *"In no event and under no circumstances shall any contributions* to this Trust by the Employer, nor any of the Trust Estate or the income therefrom revert to or be repaid to the Employer."* 793 F.2d at 122 (emphasis in original). The court specifically noted that the language upon which it relied exceeded the " 'standard pension language mandated by the Internal Revenue Code.' " *Id.* In addition, *Bryant* observed that "[e]ach case of this kind is controlled by the language of the documents creating the particular plan involved." *Id.* at 123. The *Bryant* court distinguished *Washington Star* because "the *Washington Star* plan did nothing more than prohibit diversion to any purpose other than for the exclusive benefit of participants." *Id. See also Unitis v. JFC Acquisition Co.*, 643 F.Supp. 454, 459 (N.D.Ill.1986) ("In this case, the language brings the prohibition squarely within the facts of *Bryant* rather than those of *Moyer* and *Washington Star*.").

**9.** Although not of great significance in view of ERISA's legislative history, we note that the common law permitted reversion of surplus plan assets to the employer. *See Wilson v. Bluefield Supply Co.*, 819 F.2d 457, 464 (4th Cir.1987) (discussing the fiduciary obligations under common law of trusts); *Pollock v. Castrovinci*, 476 F.Supp. 606, 616 (S.D.N.Y.1979) (same).

**10.** Cases that have read independent significance into the exclusive benefit language are

easily distinguishable because they have not construed this language in the context of surplus allocation. *See, e.g., F.D.I.C. v. Marine National Exchange Bank of Milwaukee*, 500 F.Supp. 108 (E.D.Wis.1980) (employer attempted to set off a debt against pension fund); *Calhoun v. Falstaff Brewing Corp.*, 478 F.Supp. 357 (E.D.Mo.1979) (employer breached its fiduciary duty by amending a severance plan to make otherwise eligible employee ineligible).

In *Delgrosso v. Spang and Co.*, 769 F.2d 928 (3d Cir.1985), *cert. denied,* ——— U.S. ———, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986), this court considered whether an employer could reap the surplus assets of an ERISA fund upon termination of the plan. In deciding that the employer was not so entitled, the panel did not rely exclusively on the standard ERISA "exclusive benefit" clause that Chait presses on us. Instead, the court relied on additional, explicit language commanding that "[t]he contributions made by the Company hereunder may not, under any circumstances, revert to the Company." *Id.* at 933 & n. 6. Judge Garth, speaking for the panel, examined other opinions in which employers sought similar amendments. *Id.* at 934–35. In dictum, he expressed measured skepticism about the argument advanced in *Moyer* and *Washington Star*, that we accept here, *i.e.,* that the "exclusive benefit" clause alone does not prevent reversion of the surplus assets to the employer.[11] *Id.* It is clear, however, that *Delgrosso* is distinguishable from the case *sub judice* in two major respects. First, the holding of *Delgrosso* relies on the additional language found in that plan, not merely the standard ERISA "exclusive benefit" clause. The Court discussed and emphasized the additional language and specifically distinguished the language in the plan before it from the language of the plans in *Moyer* and *Washington Star. Id.* at 935.

Second, *Delgrosso* distinguished *Moyer* and *Washington Star* because they in-

volved *defined benefit* plans—as does the Ambassador Plan. In marked contrast, the *Delgrosso* plan was originally a *defined contribution* plan under which the employer only had to contribute a fixed sum.[12] The employees were guaranteed no fixed benefit but basically took their chances that the employer's contributions would suffice to support them in their retirement. Once the employer realized that the plan was well funded, it converted the plan into a defined benefit plan. Because of the sums already in the fund, the employer paid no new sums into the fund after the conversion. Therefore, as the *Delgrosso* court explained, "all contributions to the Fund were contributions under a *defined contributions* plan and none were made under an actuarially based defined benefit plan." 769 F.2d at 930. Obviously, the employer under these circumstances did not present a sympathetic case for reversion of surplus. The surplus had amassed during the time that the amount of the employees' benefits varied with the level of the fund. Had the employer not transformed the plan, the surplus would have undoubtedly belonged to the employees and their beneficiaries. In short, the *Delgrosso* plan's initial form produced a direct relationship between surplus and expected employee benefits that puts it on a very different footing from the Ambassador Plan at issue here. *See Wilson v. Bluefield Supply Co.,* 819 F.2d 457, 459 (4th Cir. 1987) (explaining defined benefit plan).

---

**11.** *Delgrosso* stated: "Even if we were inclined to follow the reasoning of *C.D. Moyer* and *Washington Star,* and we are not persuaded that we should, neither case would require that the surplus assets should revert to [the Employer]." 769 F.2d at 935.

**12.** *But see Unitis v. JFC Acquisition Co.,* 643 F.Supp. 454 (N.D.Ill.1986). *Unitis* involved a defined benefit plan. In refusing to allow the employer to recapture surplus assets the *Unitis* court relied upon *Delgrosso,* rejecting arguments that *DelGrosso* was distinguishable because it involved a defined contribution plan. In *Unitis* the court found "the relevant question [in *Delgrosso* ] to be whether the excess funds resulted from self-imposed employer caution or bargained-for cents-per-hour contributions." *Id.* at 460. *Unitis* reasoned that if plan surplus was

generated by a mechanism that did not permit employer discretion but instead mandated certain fixed payments, the policy of allowing employers to recapture surplus in order to encourage generous funding of plans would not apply. *Unitis* relied on the existence of the collective bargaining agreement in *Delgrosso* and in the plan before it mandating certain fixed contributions as evidence that the employer would not be tempted to reduce its contributions even if the surplus were not recoverable. Although we disagree with *Unitis'* interpretation of *Delgrosso,* we note that even under its interpretation the Ambassador Plan is distinguishable. Chait has not alleged, and we find no evidence for the proposition that the employer's funding of the plan was mandated by bargained-for predetermined contributions.

## C.

Essentially, we find the "exclusive benefit" language of the Plan inconclusive. It is clear from the foregoing discussion that the exclusive benefit language is not inconsistent with § 4044 reversion of surplus to the employer. Therefore, without any additional language in the Plan prohibiting a § 4044 reversion, we cannot in this case determine, on the basis of Plan language alone, that the Ambassador Plan forbids such a reversion. On the other hand, also in view of that discussion, we are reluctant to hold that in every case this language should be ignored, or to promote as a general rule that the embodiment of fidiciary responsibility contained in the "boilerplate" language is meaningless. Fortunately, we are not called upon to make an abstract pronouncement on the significance of this standard ERISA language. Rather, we must engage in the very focused inquiry: whether this "exclusive benefit" language alone is sufficient to prevent reversion of surplus to an employer in receivership where the plan was funded entirely by the employer and the benefits were defined. In determining this question, where the pristine legal argument based on ERISA and the plan document leads to no clear result, we turn to the equities and underlying policy questions presented by the facts of this case.

At oral argument, each party argued that any reversion of the surplus to his opponent would result in an unanticipated and unmerited windfall. In a sense, both parties are correct. Neither side anticipated receiving the surplus. There is absolutely no evidence that the employees expected to receive funds above and beyond their defined accrued benefits. In fact, the expected benefits are calculable with math-ematical certainty and did not include such surplus in the equation. Simply put, the employees only expected to receive the defined benefits promised to each individual under the Plan. We agree with the statement of the panel in *Van Orman v. American Insurance Co.*, 680 F.2d 301, 310 (3d Cir.1982): "As a matter of logic, we find it difficult to perceive how plaintiffs' expectations would be frustrated by the [employer's] retention of the surplus if nothing in the [Plan] booklets and letters led them to expect that a surplus might arise." Therefore, we do not believe that any equitable principles require us to grant the surplus to the vested employees. *See Wright*, 641 F.Supp. at 1406–07 (where a plan is funded by the employer alone the "unbargained for distribution of excess assets to participants represents an unintended windfall for employees"); *Moyer*, 441 F.Supp. at 1133 (providing surplus to employee would constitute a "windfall"). *But see Bryant*, 793 F.2d at 123–24 (considering "windfall" argument and finding under its facts that prohibiting reversion would not provide a windfall for the employees).[13]

Chait argues that the ERISA policy of protecting employees' benefits weighs heavily in his favor. For this proposition he cites our language in *Harris* that courts must construe ERISA to "ensure that *bona fide* employees with long years of employment and contributions realize anticipated pension benefits." 706 F.2d at 1294 (citation omitted). In the context of this case, where vested employees have already received their anticipated benefits, we do not believe that a general policy in favor of employee recovery overcomes the strong countervailing policy considerations.[14]

We identify three important policies that, under the circumstances of this case, favor

13. We make no determination as to the rights of unvested employees. At oral argument counsel for Bernstein explained that the rights of the unvested employees will most likely be the subject of a separate determination by the IRS. Although Chait argued that by logical extension any judgment that granted him an interest in the surplus under § 411(d)(3) would also benefit unvested employees, we believe that the issue as to the unvested employees has not been raised before this Court.

14. Although we note that generally courts construe ERISA plans in favor of beneficiaries, we also note that Chait represents a unique situation. He is before us now suing as an employee covered by the Plan. As sponsor and signor of the Plan, however, he is in significant part responsible for its drafting.

reversion of the surplus to the employer. In examining these policy considerations, we are guided by the advice of the four concurring justices in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), that "courts must always bear in mind the ultimate consideration whether allowance or disallowance of particular relief would best effectuate the underlying purposes of ERISA—enforcement of strict fiduciary standards of care in the administration of all aspects of pension plans and promotion of the best interests of participants and beneficiaries." *Id.* at 3099 (Brennan, J., concurring).

First, we consider the long-range policy implications of using standard ERISA exclusive benefit language to forbid reversion of surplus to the employer. We reiterate that the Ambassador Plan was a defined benefit plan to which the employees never contributed, but rather depended on Ambassador to fund sufficiently to ensure their expected benefits. Bernstein argues persuasively that employers should be encouraged to fund such plans fully. A rule that read ERISA "exclusive benefit" language to prohibit a reversion to the employer might tempt employers to be overly cautious in funding their plans. An employer that knew that it was prohibited from recapturing the surplus might be tempted to underfund its plan—a result that would benefit no one. In the context of a defined-benefit plan to which the employer was the sole contributor that does not contain explicit prohibitory language, we see no congressional policy that would prevent allowing the employer to amend the plan to receive excess assets after paying out all the benefits. *See Wright*, 641 F.Supp. at 1407 ("Common sense dictates that employers which fund plans under ERISA guidelines should not be penalized for overfunding in an abundance of caution or as a result of miscalculation by the actuary.").

Second, it seems that § 411(d)(3) of the Internal Revenue Code may actually undermine Chait's case, rather than support it. Without determining whether a partial termination has occurred under that section, we note that should the IRS so determine, part of the alleged surplus might actually go to the *unvested* employees of Ambassador. Chait has expressed little interest in the welfare of those unvested employees. Indeed, his demand for the surplus might deprive them of their only chance to receive any benefit from the Plan. Bernstein indicates that he is aware that if the surplus reverts to Ambassador, part of it may have to go to the unvested employees.

Third, it strikes us as relevant that Ambassador is presently in receivership, and any "windfall" it receives will eventually go to good faith creditors, who, as the record indicates, will only receive pennies on the dollar. Without speculating as to Chait's personal responsibility for Ambassador's fiscal state, fairness dictates awarding any surplus to the unpaid creditors rather than to Chait and the other vested employees, all of whom received payments in accordance with the provisions of the Plan.

## IV. CONCLUSION

In conclusion, we hold that Bernstein's freezing of the Plan's assets did not prohibit him from subsequently amending the Plan to allow surplus assets to revert to Ambassador. Furthermore, we hold that despite the "exclusive benefit" language in the Ambassador Plan, Bernstein was free to return the surplus to Ambassador because the Plan contained no additional language limiting such a reversion and because the policies and the equities of this case favor Ambassador's creditors rather than the vested employees. The district court's grant of summary judgment in favor of Bernstein will therefore be affirmed.