

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-1999

# Bennett v. Conrail Matched Sav

Precedential or Non-Precedential:

Docket 97-1916

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Bennett v. Conrail Matched Sav" (1999). *1999 Decisions.* Paper 43.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/43

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 23, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-1916/1917/1918

STEVEN W. BENNETT; EDMUND L. GILLOOLEY;
JOSEPH L. ALESSANDRINI, JR.; FRANK W. HEWITT;
RICHARD E. SEMARAD; WARREN E. KAYLOR,
Individually and on behalf of all others similarly situated

v.

CONRAIL MATCHED SAVINGS PLAN ADMINISTRATIVE
COMMITTEE; DEBORAH A. MELNYK; JOHN/JANE DOES
1-10; CONSOLIDATED RAIL CORPORATION MATCHED
SAVINGS PLAN

  Steven W. Bennett; Edmund L. Gillooley;
  Joseph L. Alessandrini, Jr.; Frank W. Hewitt;
  Richard E. Semarad; Warren E. Kaylor,
  Individually and on behalf of all members of the
  proposed class,

  Appellants in 97-1916.

JOANNE KELLY, Individually and on behalf of all others
similarly situated

v.

CONRAIL MATCHED SAVINGS PLAN ADMINISTRATIVE
COMMITTEE; DEBORAH A. MELNYK; JOHN/JANE DOES
1-10; CONSOLIDATED RAIL CORPORATION MATCHED
SAVINGS PLAN

  Joanne Kelly,

  Appellant in 97-1917.

GEORGE E. GALE, III, Individually and on behalf of all
others similarly situated,

     Appellant 97-1918.

v.

CONRAIL MATCHED SAVINGS PLAN ADMINISTRATIVE
COMMITTEE; DEBORAH A. MELNYK; JOHN/JANE DOES
1-10; CONSOLIDATED RAIL CORPORATION MATCHED
SAVINGS PLAN

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action Nos. 97-cv-04535; 05017 & 05345)
District Judge: Honorable Harvey Bartle, III

Argued July 13, 1998

Before: SLOVITER and ROTH, Circuit Judges
FEIKENS,[1] District Judge

(Opinion filed February 23, 1999)

     Alan M. Sandals, Esquire (Argued)
     Howard I. Langer, Esquire
     Sandals, Langer & Taylor, LLP
     1650 Market Street
     One Liberty Place, 47th Floor
     Philadelphia, PA 19103

     Attorney for Appellants Bennett,
     Gillooley, Alessandrini, Hewitt,
     Semarad and Kaylor

_____

1. The Honorable John Feikens, United States District Court Judge for
the Eastern District of Michigan, sitting by designation.

Kenneth I. Trujillo, Esquire
Ira Neil Richards, Esquire
Trujillo, Rodriguez & Richards, LLC
226 West Rittenhouse Square
The Penthouse
Philadelphia, PA 19103

 Attorneys for Appellants
 Kelly, et al.

David Berger, Esquire
Harold Berger, Esquire
Stanley R. Wolfe, Esquire
Patricia D. Gugin, Esquire
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103

 Attorneys for Appellants
 Gale, et al.

Laurence Z. Shiekman, Esquire
 (Argued)
Brian T. Ortelere, Esquire
Pepper Hamilton LLP
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103-2799

 Attorneys for Appellees

OPINION OF THE COURT

ROTH, Circuit Judge:

Appellants are former employees of Conrail Corporation. They challenge the distribution of surplus assets of an employee stock ownership plan ("ESOP" or the "Plan"). The Plan is governed by the Employee Retirement Income Securities Act ("ERISA"). We must decide whether ERISA entitled the former employees to a portion of the cash surplus in the Plan that resulted from a favorable tender offer for Conrail's stock. Appellants argue that under ERISA they are entitled to share in the surplus and that Conrail's

3

failure to permit them to do so violates fiduciary duties imposed by ERISA. We conclude that appellants were not entitled to participate in the apportionment of the surplus and that the District Court correctly dismissed their claims.

## I. FACTS

In 1990, Conrail established a voluntary savings plan for non-union employees. The Plan was a defined contribution plan[2] and included an employee stock ownership plan and a deferred compensation plan. To get established, the Plan borrowed $290 million from Conrail to purchase a specially created class of Conrail preferred stock. This stock was held in an unallocated account. Participating employees contributed a portion of their salary into individual accounts and Conrail matched these contributions with stock from the unallocated account. These contributions vested immediately. Under the Plan, "all amounts allocated to the Account of a Participant shall be fully vested and nonforfeitable at all times." Conrail Plan Agreement, P 12.1. The benefits, which accrued under the defined contribution plan, were based solely on the performance of the shares in the individual accounts. As the District Court noted, the benefits depended on the vagaries of the marketplace.

Shortly after establishing the Plan, Conrail began to terminate employees. A terminated employee was entitled "to a distribution of all amounts credited to his account." Conrail Plan Agreement, P 8.1. Appellants do not dispute that they were fully vested and that, when they were terminated by Conrail, they were credited with the total vested balance in their individual accounts.

In 1997, Norfolk Southern and CSX Corporations made a favorable tender offer to purchase Conrail. The tender offer was for all outstanding shares of Conrail stock, including

_____

2. In a defined contribution plan "employees are not promised any particular level of benefits; instead they are promised only that they will
receive the balance in their individual accounts." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 637 n.1 (1990). This is in contrast to a defined benefit plan which provides a fixed benefit to the employee. 29 U.S.C. S 1002(35).

4

shares held in the unallocated account. The price Norfolk Southern and CSX paid for the stock was substantially in excess of its market value. After the Plan repaid Conrail the funds which it had borrowed to establish the Plan, the Plan's share of the proceeds from the tender offer resulted in a cash surplus of approximately $533 million in the unallocated account.

In June 1997, the Plan was amended to allocate this surplus to persons employed by Conrail from 1996–1998.[3] The amendment provided that these allocations would be made to the maximum extent allowed under the Internal Revenue Code (either $30,000 or 25% of annual compensation for the eligible employee, whichever is less). Employees terminated or otherwise separated from employment with Conrail before 1996 were not eligible to share in the surplus. Appellants are among this ineligible group.

Appellants brought suit in the U.S. District Court for the Eastern District of Pennsylvania, alleging two counts of ERISA violations. The District Court concluded that appellants received their accrued benefits as mandated by ERISA and for that reason they were not entitled to share in the surplus. The District Court dismissed both counts for failure to state a claim under Rule 12(b)(6). This appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this action based on 28 U.S.C. S 1331 and 29 U.S.C. S 1132(e). We have jurisdiction over the appeal of the dismissal pursuant to 28 U.S.C. S 1291. We review a dismissal under Rule 12(b)(6) under a plenary standard of review. Malia v. General Electric Co., 23 F.3d 828, 830 (3d Cir. 1994).

_____

3. Under the Plan, Conrail's Board of Directors could "amend or terminate, in whole or in part, the Plan . . . at any time and in any manner, without prior notification. . . . no amendment to the Plan shall decrease a Participant's benefit or eliminate an optional form of distribution. No amendment shall make it possible for any assets of the Plan to be used for or diverted to any purpose other than for the exclusive benefit of Participants and Beneficiaries." Plan at P 14.1.

III. DISCUSSION

Appellants' complaint set forth two counts, alleging violations of ERISA. First, they claim that Conrail violated ERISA and tax code provisions governing partial and complete termination of pension plans. In the second count, they allege that under ERISA, Conrail breached its fiduciary duty by amending the Plan to adopt an inequitable distribution scheme. Appellants contend that on its termination, the Plan was essentially a "wasting trust" and therefore Conrail had a duty to distribute all its assets equitably.

A. Partial Termination

We turn first to appellants' claim that a partial termination occurred and that the partial termination mandated distribution of a share of the unallocated assets to appellants. Appellants contend that the Plan was partially terminated when in 1990, shortly after Conrail had established it, Conrail started laying off employees. Appellants argue that, under the Internal Revenue Code, a partial termination requires the distribution of unallocated Plan assets to the terminated employees. 26 U.S.C. S 411(d)(3).

The District Court assumed that the employees were correct in contending that the layoffs constituted a partial termination of the Plan. This assumption is consistent with our conclusion in Gluck v. Unisys Corp., 960 F.2d 1168, 1183 (3d Cir. 1992), that "partial termination...involves a significant reduction in plan liability by means of a corresponding reduction in employee benefits. That reduction may be achieved either by excluding a segment of employees, or by reducing benefits generally." Since we have found that excluding employees through layoffs is a "vertical partial termination," id., the District Court reasonably assumed that a partial termination had occurred.

This conclusion does not, however, help appellants. Even though a partial termination of the Plan may have occurred, the tax code does not afford the appellants the relief they seek. Appellants argue that the Internal Revenue

6

Code requires any partially terminated tax-qualified pension plan to distribute benefits to all "affected employees." They cite to 26 U.S.C. S 411(d)(3), which provides that a plan will retain its tax qualified status if

> upon its termination or partial termination . . . the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts are nonforfeitable.

Appellants' reliance on this section is, however, misplaced. Section 411(d)(3) refers only to "benefits accrued." The code defines "benefits accrued" for defined contribution plans as the balance in the individual's account. 26 U.S.C. S 411(a)(7)(A)(ii).4 In addition, as S 411(d)(3) makes clear, affected employees are entitled to "benefits accrued to the date of such termination, [or] partial termination." Appellants were fully vested in the balance in their accounts when they were laid off, but their contributions to the Plan ceased at that time. The Plan would not reopen as to them to gather in further assets to accrue for their benefit. Indeed, by the express language of the Plan, only participants having a base salary earned for services could contribute to the Plan. Plan Agreement, P 3.1 and p. 3. For that reason, after their lay-off, appellants were no longer entitled to receive new benefits in the Plan.

Moreover, appellants are conflating accrued benefits with plan assets. Assets and benefits are treated differently under ERISA. As we noted in Malia:

> "benefits" are elements that are conceptualized and treated differently in a plan termination than are "assets" of that plan. "Benefits" are computed in a different manner than "assets." Accrued benefits are placed on the liability side, rather than on the asset side of the balance sheet.

23 F.3d at 832.

_____

4. ERISA also defines "accrued benefit" as the balance of an individual's account. 29 U.S.C. S 1002(23)(B).

7

In Malia, two pension plans merged resulting in surplus assets. Participants sued to receive the surplus in addition to their benefits under the defined benefit plan. In upholding the dismissal of the employees' claims, we held that assets and benefits are distinct. Unallocated assets are not the same as accrued benefits. ERISA protects only anticipated benefits, not surplus assets.

We came to a similar conclusion in Chait v. Bernstein, 835 F.2d 1017 (3d Cir. 1987), where, in considering the applicability of S 411(d)(3) of the tax code to a claim for surplus assets after a partial termination of an employee benefit plan, we held that "the purposes and policies of partial terminations under the tax code do not apply in the context of vested employees attempting to gain plan surplus." Id. at 1021.

The appellants argue, however, that Treasury Regulation S 1.411(d)–2(a)(2)(i) supports their position that they are entitled to their share of the surplus. This regulation provides that, in order for a plan to remain a tax qualified one upon partial termination, unallocated funds must be allocated to covered employees:

> (2) Required allocation. (i) A plan is not a qualified plan
> . . . unless the plan provides for the allocation of any
> previously unallocated funds to the employees covered
> by the plan upon termination or partial termination of
> the plan . . ..

Treas. Reg. S 1.411(d)–2(a)(2)(i). As the District Court pointed out, however, this regulation does not "require the allocation of amounts to the account of any employee if such amounts are not required to be used to satisfy the liabilities with respect to employees and their beneficiaries under the plan." Treas. Reg. S 1.411(d)–2(a)(2)(iii).

The question then is whether the accumulation of a surplus in a plan may properly be considered an outstanding liability of that plan. We conclude that it should not be so considered. As we determined in Malia, accrued benefits are liabilities of a plan; assets (such as surplus) fall on the other side, the asset side, of the balance sheet. See 23 F.3d at 832.

8

Nevertheless, appellants argue that, since the Plan contains no employer reversion provision, there is nowhere for the surplus to go but to them.5 For this reason, they contend, distribution of the surplus must be considered an outstanding liability. While appealing in its simplicity, this "by process of elimination argument" fails because, as we have pointed out, benefits are a liability of a plan; assets are not.

We conclude, therefore, that both under the relevant portions of the tax code and under the applicable treasury regulations, appellants are not entitled to share in the surplus upon partial termination of the Plan.

Appellants next urge that Conrail's failure to distribute surplus assets to them upon partial termination of the Plan constituted a breach of the duties imposed by ERISA. Their first argument relies on 29 U.S.C. S 1344 (S 4044 of ERISA). They contend that S 1344 requires that, upon termination, plan assets be distributed equitably. However, S 1344 applies to the partial termination of a plan only when the plan provides that it do so. Ashenbaugh v. Crucible Inc., 1975 Salaried Retirement Plan, 854 F.2d 1516, 1529 n.15 (3d Cir. 1988). The Conrail Plan does not so provide. Therefore, appellants' argument that S 1344 should apply to this partially terminated plan is unavailing.

Finally, appellants argue that the distribution scheme simply is unfair. They contend that they assumed the risk of the market performance of the Conrail stock throughout their tenure at Conrail and now they are being excluded when it comes time to realize the reward of its increase in value. However, ERISA does not confer substantive rights on employees; rather it ensures that they will receive those benefits that the employers have guaranteed to them. See Hughes Aircraft Co. v. Jacobson, No. 97-1287, 1999 WL 24546, at *6 (U.S. Jan. 25, 1999). As we stated in Malia:

> ERISA provides for comprehensive federal regulation of
> employee pension plans . . . . [T]he major concern of

_____

5. Typically, defined contribution plans do not include a provision for reversion to the employer. See H.R. Conf. Rpt. No. 841, 99th Cong., 2d Sess. at Vol. II-482 (1986), reprinted in 1986 U.S.C.C.A.N. 4078, 4570.

> Congress was to ensure that bona fide employees with
> long years of employment and contributions realize
> anticipated pension benefits.

23 F.3d at 830, quoting, Reuther v. Trustees of Trucking
Employees of Passaic and Bergen County Welfare Fund, 575
F.2d 1074, 1076-77 (3d Cir. 1978). While ERISA provides
that a fiduciary must act "(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries;"
29 U.S.C. S 1104(a)(1)(A), ERISA does no more than protect
the benefits which are due to an employee under a plan.

It is true that appellants' level of benefits was contingent
on the performance of Conrail securities purchased for their
individual accounts, based on their level of contribution. As
the value of those securities went up, so did the value of
their accounts. Accordingly, appellants realized the increase
in value of those securities while appellants were
participants in the Plan. However, ERISA only guarantees
them the level of the benefits accrued up to the time of
their termination by Conrail. For this reason, the windfall,
from which they claim they were excluded, was not one to
which they were entitled.

Moreover, appellants overstate the magnitude of the so-
called windfall. The distribution of the cash surplus can
only be made up to the limit allowed by the tax code. This
is the lesser of 25% of an employee's salary or $30,000.
Since many of the employees who receive this "windfall" will
lose their jobs as a result of the CSX-Norfolk Southern
takeover, the amount of their windfall hardly seems
inequitable.

Even if we conclude then that a partial termination did
occur as a result of the layoffs at Conrail, ERISA protects
only accrued benefits. These were credited to appellants in
the form of the balance of the individual accounts
guaranteed to appellants when they were laid off.
Appellants are not entitled to the surplus that resulted from
the tender offer.

B. Complete Termination of the Plan and
        Application of S 1344

We now turn to the application of 29 U.S.C. S 1344 to a
complete termination of the Plan. Appellants assert that,

10

even if no partial termination occurred, they were entitled to share in the surplus when Conrail completely terminated the Plan in May 1997. They argue that S 1344(d) governs the distribution of residual assets when a plan is terminated and that, pursuant to its language, former employees should share in the surplus.

Appellants point out that ERISA directs that a plan termination be conducted according to the procedure set forth in S 1344. Section 1103(d) provides that "[u]pon termination of a pension plan . . . the assets of the plan shall be allocated in accordance with the provisions of section 1344 . . .." 29 U.S.C. S 1103(d)(1). Section 1103(d)(2) further provides that a plan's assets shall be distributed "in accordance with the terms of the plan."

Section 1344(d) regulates the distribution of residual assets to the employer after the satisfaction of all liabilities to plan participants. It reads in part:

> (1) Subject to paragraph (3), any residual assets of a single-employer plan may be distributed to the employer if--
>
> (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
>
> (B) the distribution does not contravene any provision of law, and
>
> (C) the plan provides for such distribution in these circumstances.
>
> * * *
>
> (3)(A) Before any distribution from a plan pursuant to paragraph (1), if any assets of the plan attributable to employee contributions remain after satisfaction of all liabilities described in subsection (a) of this section, such remaining assets shall be equitably distributed to the participants who made such contributions or their beneficiaries (including alternate payees, within the meaning of section 1056(d)(3)-(K)) of this title.

29 U.S.C. S 1344(d) (emphasis added).

11

Appellants are correct that ERISA directs that a plan termination be conducted in accord with S 1344 and that S 1344(d) governs the distribution of residual assets. Appellants argue that, since ERISA defines "participants" to include employees and former employees, 29 U.S.C. S1002(7), appellants should be included in the allocation described in S 1344(d). The plain language ofS 1344(d), however, proves the error of their argument. Section 1344(d) applies only when an employer is seeking a reversion of assets to itself. 29 U.S.C. S 1344(d)(3)(A). That is not the case here. Appellants concede that the Plan contains no employer reversion provision. In addition, S 1344(d) refers to the distribution of residual assets "attributable to employee contributions." This case, however, involves the distribution to participants of a surplus resulting from a favorable tender offer, not a distribution of the remainder of their contributions. For these reasons, we conclude that S 1344 does not entitle appellants to a share of the surplus assets.

Finally, appellants argue that in amending the Plan to create the distribution scheme now under attack, Conrail violated its fiduciary duties to act with loyalty and impartiality. ERISA basically requires that fiduciaries comply with the plan as written unless it is inconsistent with ERISA. 29 U.S.C. S 1104(1)(D). Chait v. Bernstein, 835 F.2d 1017 (3d Cir. 1987) (receiver who took over management of corporation that contributed to plan did not self-deal when he terminated the plan in accord with ERISA.) Essentially, appellants claim that Conrail's actions inure to the benefit of management and to the exclusion of plan participants in direct contravention of ERISA. Because we find that appellants are not entitled to any of the surplus either upon partial termination or complete termination, we find appellants lack standing to challenge the manner in which that surplus is ultimately distributed. In short, they are not harmed by the distribution scheme.6

_____

6. Since appellants lack standing to challenge the distribution scheme, we will take no position at this time whether the scheme is in accord with ERISA.

## C. Fiduciary Duty

The second count of the dismissed complaint makes a claim of breach of fiduciary duty by Conrail. Appellants argue that, when terminated, the Plan became a "wasting trust"7 and as a consequence Conrail had an obligation under common law to distribute all the assets equitably. Conrail contends that its actions in amending the Plan were not those of a fiduciary under ERISA.

ERISA imposes fiduciary duties in the administration of plans which it governs. American Flint Glass Workers Union v. Beaumont Glass Co., 62 F.3d 574, 579 (3d Cir. 1995); Walling v. Brady, 125 F.3d 114, 118-19 (3d Cir. 1997). We have recognized, however, that ERISA permits employers to "wear `two hats'," one as plan administrator, the other as plan sponsor. Blaw Knox Retirement Income Plan v. White Consol. Indus., 998 F.2d 1185, 1189 (3d Cir. 1993), quoting, Payonk v. HMW Indus., Inc., 883 F.2d 221, 225 (3d Cir. 1989). Fiduciary duties attach to the actions of employers " `only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." Id.

Under ERISA, an employer has broad authority to amend a plan, Hughes Aircraft, 1999 WL 24546, at *5 (holding that where employer "makes a decision regarding the form or structure of the plan," ERISA's fiduciary duty requirement is not implicated). In amending a plan, the employer is acting as a settlor. Id.; Lockheed Corp. v. Spink, 517 U.S. 882, 890 (1996). There are portions of ERISA which govern plan amendments; for example, under S 1054(g), an amendment may not decrease accrued benefits. However, as long as an amendment does not violate a specific provision of ERISA, "the act of amending a pension plan does not trigger ERISA's fiduciary provisions." See Hughes Aircraft, 1999 WL 24546, at *5. Thus, the mere fact that Conrail amended its Plan did not breach any fiduciary duties under ERISA.

_____

7. A "wasting trust" is recognized under common law as a trust that has had its purposes accomplished so that its continuation would frustrate the settlor's intent. See Hughes Aircraft Co. v. Jacobson, No. 97-1287, 1999 WL 24546, at *9 (U.S. Jan. 25, 1999).

With regard to appellants' wasting trust argument, because ERISA is a "comprehensive and reticulated statute" and is "enormously complex and detailed," it should be supplemented by the common law only where ERISA does not address an issue. See Hughes Aircraft, 1999 WL 24546, at *6; Jordan v. Fed. Express Corp., 116 F.3d 1005, 1017–18 (3d Cir. 1997). Moreover, even if we were to invoke the common law, the Plan was not a wasting trust. The Plan itself provided for its termination and the distribution of its assets. The District Court found that the Plan could not be likened to a wasting trust because it was an active plan up until just six months prior to the filing of this suit. Thus, appellants' fiduciary duty arguments under their common law claim must fail.

IV. CONCLUSION

For the reasons stated above, we will affirm the judgment of the District Court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit